**A–TRANSPORT NORTHWEST CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 90–224C.**

United States Court of Federal Claims.

Nov. 25, 1992.

Michael A. Larson, Seattle, Wash., attorney of record, for plaintiff.

Elizabeth A. Cavendish, Commercial Litigation Branch, Civil Div., Dept. of Justice, Washington, D.C., with whom were Sharon Y. Eubanks, Asst. Director, David M. Cohen, Director, and Stuart M. Gerson, Asst. Atty. Gen., attorneys of record, for defendant.

## OPINION

HORN, Judge.

### BACKGROUND

This case comes before the court on the plaintiff's motion for partial summary judgment and the defendant's cross-motion for summary judgment.[1] The plaintiff, A–Transport Northwest, Inc. (A–Transport), is a Seattle-based, minority-owned trucking firm, which is no longer in business. Plaintiff claims that it is entitled to compensation for a breach of contract arising from the resolicitation of a Perishable Subsis-

---

1. This court's jurisdiction was invoked pursuant to 28 U.S.C. section 1491 (1988), and is uncontested.

tence Carrier Rate Tender and Service Agreement (Tender Agreement). Plaintiff further alleges that defendant was without authority to cancel the Tender Agreement with the defendant, or to cause it to be rebid.

In response, the government asserts that the Tender Agreement standing alone is not a contract, but is more properly characterized as a continuing offer to perform transportation services for stated prices. Thus, the defendant argues, no contract was formed between the parties until each time the Tender Agreement was incorporated by reference on the face of a Government Bill of Lading.[2] The defendant maintains, however, that even if the Tender Agreement was a contract, the terms of the Tender Agreement permitted the government to resolicit if its supply point changed. Moreover, according to the defendant, A–Transport may not recover because the company elected to continue performance under a resolicited agreement, and because no bad faith was demonstrated by the government in its decision to resolicit or the manner in which the resolicitation was executed.

After careful consideration of the briefs filed by the parties, the oral argument held on the cross-motions for summary judgment, consideration of the numerous other materials filed by the parties, and for the reasons discussed below, the court, hereby, GRANTS the defendant's cross-motion for summary judgment. The plaintiff's motion for partial summary judgment is, therefore, DENIED.

### FACTS

The United States, acting through the Military Traffic Management Command (MTMC) and the Defense Logistics Agency (DLA), procures interstate freight transportation services pursuant to the Interstate Commerce Act, as amended, 49 U.S.C. § 10721 (1983), and Interstate Commerce Commission regulations. Resulting agreements are exempt from the Federal Acquisition Regulations (FAR), FAR 47.200(b)(3), or the Defense FAR Supplement (DFAR) § 201.103(b).

On July 1, 1986, the Defense Logistics Agency in Alameda, California (DLA Alameda) invited A–Transport and other Seattle, Washington-based trucking firms to submit their proposed rates for transporting perishable foods, including meats, fish, dairy products, fruits and vegetables, from a cold storage warehouse in the Seattle area to government installations in Washington, Oregon, Idaho, Montana, and California.[3] The invitation specified that the "rate tenders" offered by the carriers must be firm for the effective period of the tender (January 1, 1987 through December 31, 1988), and that rates could not be increased unless a general increase was granted by the regulatory authority, and, after negotiation, the government agreed to pay it.

The invitation to submit offers issued by the government also outlined provisions similar to those found in sealed bid procurements. The tender offers were to be sealed, and not opened until 1:00 p.m., August 1, 1986. The government announced that no late offers would be considered. Submissions which deviated from the tender format would eliminate that carrier from consideration. If equally low rates were submitted, a drawing would be held to break the tie, and, as in sealed bid procurements, an abstract of rates offered would be available to the public.

Additionally, the invitation provided that once selected by MTMC, the primary carrier was expected to provide "responsive, responsible" service, in accordance with the pickup and delivery schedules. The government retained the right to remove the primary carrier(s) at any time for failure to perform satisfactorily, and to remove a car-

---

**2.** Each time the carrier performed services, under the Tender Agreement, the contractor filled in a Government Bill of Lading to reflect the services performed.

**3.** The invitation consisted of a three page cover memo, the Perishable Subsistence Carrier Rate Tender and Service Agreement (to be returned to DLA Alameda, with quoted rates), an estimate of annual tonnage, and a questionnaire for rail carriers not applicable to this litigation.

rier from all destinations should the carrier withdraw service to a particular location. DLA expected the carrier to offer rates knowing that volume estimates included in the invitation documents were not guaranteed. The government also reserved the right to use cold storage warehouses other than those identified as distribution points.

By letter, dated November 14, 1986, after the invitation was issued, but before offering carriers had been notified of whether their tenders had won primary or secondary status, the government notified participating carriers that the Seattle Cold Storage warehouse location, from which pickups were to have been made, had been moved to Algona, Washington, approximately twenty-five miles from Seattle. Carriers also were notified that the move was planned for the following month and that no increase in rates would be authorized because of the change. At no time did A–Transport attempt to withdraw its existing Tender Agreement.

On November 16, 1986, MTMC sent letters to selected carriers notifying them that their tender offers had been accepted. For the Seattle area, A–Transport was chosen as the primary carrier for 23 destinations, and as a secondary carrier for the remaining 21 routes. All selected carriers were "required" to provide satisfactory service for the twenty-four month period, commencing January 1, 1987.

The terms and conditions of service were expressly incorporated into the Perishable Substance Carrier Rate Tender and Service Agreement. For the purposes of this case, the accepted Tender Agreement with A–Transport set forth a number of important provisions. While it was understood that primary carriers would be entitled to all available traffic based on military requirements, the government did not guarantee that the traffic would amount to the estimate given in the Request for Tender. The carrier could pass on as much of a general regulatory rate increase as the government would accept, subject to negotiation, but, in that case, the government retained the option of using the lowest cost carrier, notwithstanding the initial carrier selection.

With thirty days written notice, the carrier could amend the Tender Agreement, or could do so upon shorter notice, by mutual agreement. If the carrier notified the government of a discontinuance of service, the government reserved the right to accept selective discontinuance of service or to discontinue use of the tender in its entirety. The government could change the schedule with reasonable advanced written notice.

Item 18(d) of the Tender Agreement allowed the government to resolicit the agreements:

... Should changing supply missions or requirements make it necessary for the Government to make distribution from a new supply point, those carriers selected under procedures outlined herein, will receive notice no less than thirty days in advance of such change, and will be invited to tender rates for their services under such new requirements as may be indicated on a competitive basis with other qualified carriers. The furnishing of thirty (30) days notice to the carriers is not intended to apply to relocation of distribution points within the same commercial zone....

The relocation of the Seattle Cold Storage Company to its new warehouse in Algona meant that the government would now be making distribution from a new supply point, which, however, was within the same commercial zone as the earlier supply location. A–Transport's Tender Agreement, however, reflected a loading and pick-up schedule based on the former location of the warehouse. Accordingly, on November 26, 1986, DLA in Seattle proposed that all carriers, including A–Transport, agree to modify the loading and delivery schedule included in the Tender Agreement (with final approval by MTMC to follow), to reflect changes resulting from the Algona move. No increases in cost were mentioned. While A–Transport concurred with the schedule modification, the company expressed several reservations. In particular, A–Transport questioned a later pick-up time, indicating that afternoon deliveries could be delayed as a result. On January 29, 1987, DLA Alameda asked for

A–Transport's acceptance of additional changes to the loading and delivery schedule, again with no cost increase. This time A–Transport refused to sign the proposed modification. In a letter dated February 6, 1987, A–Transport indicated that loading and counting the freight as proposed was inconsistent with the current delivery schedules. On February 12, 1987, A–Transport rescinded its earlier acceptance of the first schedule revisions (the changes had not yet been given final approval by MTMC), and outlined those specific changes which the company would and would not accept. Finally, A–Transport indicated that it would revise the schedules and procedures only after the government conducted an investigation into how the Tender Agreements were being frustrated by DLA policies.[4]

On April 7, 1987, in a memo entitled "Carrier Performance Problems," DLA Philadelphia requested approval by MTMC to resolicit the Seattle tender agreements. The memo, which described difficulties previously encountered in the Algona area, reported that DLA's supply mission and requirements had been adversely affected by a number of factors. These included: 1) relocation of the cold storage contractor; 2) the desire of DLA's customers to revise delivery schedules; 3) the need to reduce loading times to accommodate the warehouse contractor's desire to improve service through palletization; and, 4) A–Transport's alleged concentration on deliveries to seven highly profitable destinations which, it was suggested, was a result of utilizing impermissible rates which did not decrease as minimum weights increased (known as rate regression).

MTMC responded on May 4, 1987, rejecting the internal DLA recommendation to resolicit, and instead suggested that DLA attempt to obtain the approval of the new schedule from all the carriers, without an increase in rates. MTMC also discussed referring the rate regression question to its Freight Services Branch, Staff Judge Advocate, or if necessary the General Services

Administration. On June 11, 1987, A–Transport rejected the government's proposal and reemphasized to DLA Alameda that the proposed schedule changes did not allow enough time to perform the tasks required in the original tender. At the same time, A–Transport charged that DLA was verbally requiring vehicles for "exclusive use," but refusing to pay the higher charges required by the Tender Agreement. A–Transport indicated that it was willing and capable to continue working, but that the proposed revisions would adversely affect the originally tendered rates offered by the company and, therefore, would not be acceptable.

On June 19, 1987, DLA Alameda wrote to DLA Philadelphia, again expressing frustration at not being able to persuade A–Transport to agree to the proposed changes. Five of six carriers with which the government had existing Tender Agreements, and with which the government attempted to renegotiate, not including A–Transport, agreed to the modifications. Thereafter, in June, 1987, DLA Philadelphia reported to MTMC: "... [E]fforts to bring A–Transport to a level of satisfactory service have not been successful." The internal memo cited several areas of concern, including:

A. Repeated overcharges on GBLs, reference GSA audit.

B. Continued failure of A Transport Northwest Co. to reconcile the audit situation with the Comptroller General.

C. Ongoing disputes with Seattle Cold Storage regarding a 1500 pallet debt.

D. The erroneous filing of rates contrary to industry practice, i.e. non-regressing rates.

E. The practice of tape recording telephone conversations without the knowledge or consent of the calling party and the use of those tapes, out of context, at other Government agencies to tarnish the credibility of Government officials.

The government finally concluded that resolicitation was necessary, and, on July 13, 1987, recommended issuance of a resoli-

---

**4.** It is undisputed that, despite A–Transport's complaints and refusal to sign the modification, the carrier continued performance in accordance with the revised schedules.

citation. DLA was instructed to limit mailings to only those carriers currently holding agreements. MTMC also advised DLA to indicate why the resolicitation was being issued, and to refer to the requirement for proper rate regression in the new tender.

On August 18, 1987, the DLA issued the resolicitation of the Seattle rate tender, stating that it was necessary because of the unacceptability of the modifications proposed by the government. The new tenders, to be effective for a fourteen-month-period from November 1, 1987 through December 31, 1988, contained revised loading and pick-up schedules, in addition to language on the unacceptability of rate regressions. Invitations were sent to all carriers holding agreements, including A–Transport. Also, on August 18, 1987, DLA Alameda cited three, specific examples of A–Transport's unsatisfactory service and requested that the carrier provide a detailed report of findings and corrective actions.

On October 23, 1987, MTMC announced the selection of carriers for the resolicited tender. All prior tender agreements and rankings in the Seattle area, effective January 1, 1987, were cancelled. While A–Transport, again, had been awarded more destinations than any other carrier, it had a net loss of five routes.

## DISCUSSION

Summary judgment in the United States Claims Court is properly granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Claims Court (RUSCC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R.Civ.P.) and is similar in language and effect.[5] Both Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RUSCC (c); Fed.R.Civ.P. 56(c). Rule 56(c) of the Rules of the United States Claims Court provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of showing that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Ass'n, Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991).

Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Unig Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one-sided that one party must

5. Following the enactment of P.L. 102–572 (1992), the United States Claims Court was renamed the United States Court of Federal Claims. The Rules will be named to conform in the near future.

In general, the Rules of the United States Claims Court (RUSCC) are closely patterned upon the Federal Rules of Civil Procedure (Fed. R.Civ.P.). Therefore, precedent under the Fed. R.Civ.P. is relevant to interpreting the RUSCC, including RUSCC 56(c). *See Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. As indicated above, any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Industrial Products, Inc. v. Solid State Systems Corp.*, 755 F.2d 158, 163 (Fed.Cir. 1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■ The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged, if the moving party can show, alternatively, that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assoc.*, 20 Cl.Ct. at 679. If the moving party makes this showing, the burden is placed on the nonmoving party to show that a genuine factual dispute exists by presenting evidence establishing the existence of an element of its case upon which it bears the burden of proof. *Lima Surgical Assoc.*, 20 Cl.Ct. at 679. The logic behind this addition is simple. If, under no scenario, can the nonmoving party present the evidence necessary to support its case, then there should be no genuine need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Under Rule 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. Gen-

erally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and admissions, in order to show that a genuine issue for trial exists. *Celotex v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553.

■ The fact that both parties have moved for partial or full summary judgment, based on the alleged absence of genuine issues of material fact, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)). "Simply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969). *See also Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Cas. & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States*, 812 F.2d at 1391.

In the instant case, the court agrees with both parties that with respect to liability there are no genuine issues of material fact to preclude summary judgment. Reserving the question of damages for possible later proceedings, the only issues currently to be resolved by the court are: whether the Tender Agreement was an enforceable contract; whether the government's resoli-

citation of the agreement was permissible within the terms of the agreement; and, whether by resoliciting the agreement, the government acted in bad faith.

In support of its position that the Tender Agreement was an enforceable contract, the plaintiff maintains that it was, in effect, a requirements contract. The defendant rejects that argument. The defendant contends that because the Tender Agreement was solicited pursuant to the Interstate Commerce Act, 49 U.S.C. § 10721, it was not a contract, but a continuing offer to perform transportation services for stated prices. As such, defendant contends that the quoted prices in A–Transport's Tender Agreement allowed the government to make a series of separate contracts by a series of independent acceptances, until revoked by the offeror. Moreover, the government maintains that the Government Bill of Lading (GBL) constituted the acceptance to the Tender Agreement offer and that the GBL became the basic contract between the shipper-consignor and the carrier. According to the defendant, the Tender Agreement became binding only when it was incorporated by reference in the GBL. Therefore, the defendant argues, when the government resolicited the Tender Agreement in August 1987, the defendant could not have been breaching a contract, since none existed.

The defendant also maintains that the Tender Agreement was not a contract because it lacked mutuality of obligation. In support, defendant points to several factors: A–Transport could decline to carry individual loads; plaintiff, without penalty, could discontinue service to any particular combination of destinations with 30 days notice; the government was not required to ship any goods at all; and a government contracting officer did not sign the Tender Agreement.

■ The court is not bound by the name given to a contract. Rather, it must look to the actual terms of the contract to determine its character. *Ralph Constr., Inc. v. United States,* 4 Cl.Ct. 727, 731 (1984). *See also Torncello v. United States,* 231 Ct.Cl. 20, 27, 681 F.2d 756, 760

(1982). It is true that a contract which does not require the government to take, or to limit its demand to any ascertainable quantity is unenforceable for lack of consideration and mutuality. *Willard, Sutherland & Co. v. United States,* 262 U.S. 489, 493, 43 S.Ct. 592, 594, 67 L.Ed. 1086 (1923). However, "[i]t is now beyond question that contracts for requirements do not lack mutuality and are enforceable. In every case it is the reasonable expectation by both parties that there will be requirements on which the bargain is grounded." *Locke v. United States,* 151 Ct.Cl. 262, 266, 283 F.2d 521, 523 (1960). "Requirements contracts also lack a promise from the buyer to order a specific amount, but consideration is furnished, nevertheless, by the buyer's promise to turn to the seller for all such requirements as do develop. Such contracts are clearly enforceable on that basis." *Torncello,* 231 Ct.Cl. at 28–29, 681 F.2d at 761. *See Brawley v. United States,* 96 (6 Otto) U.S. 168, 172, 24 L.Ed. 622 (1878); *Shader Contractors, Inc. v. United States,* 149 Ct.Cl. 535, 540–43, 276 F.2d 1, 4–6 (1960). "The entitlement of the seller to *all* of the buyer's requirements is the key, for if the buyer were able to turn elsewhere for some of its needs, then the contract would not be distinguishable from an [unenforceable] indefinite quantities contract...." *Torncello,* 231 Ct.Cl. at 29, 681 F.2d at 761–62 (emphasis in original). Furthermore, "... [i]f a contract is susceptible of interpretation as either an indefinite quantities without minimum agreement or as one for requirements, the court should uphold it as of the requirements type." *Ralph Constr.,* 4 Cl.Ct. at 732. *See E.H. Sales, Inc. v. United States,* 169 Ct.Cl. 269, 274, 340 F.2d 358, 360–61 (1965); *Goldwasser v. United States,* 163 Ct.Cl. 450, 453, 325 F.2d 722, 723 (1963).

In *Southern Pacific Transportation Company,* the Supreme Court stated: "[t]he bill of lading is the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers." *Southern Pac. Transp. Co. v. Commercial Metals Co.,* 456 U.S. 336, 102 S.Ct. 1815, 72 L.Ed.2d 114 (1982) (citing *Texas &*

*Pac. R.R. Co. v. Leatherwood*, 250 U.S. 478, 481, 39 S.Ct. 517, 518, 63 L.Ed. 1096 (1919)). Until recently, the court's acceptance of the bill of lading as the basic transportation contract has led the Comptroller General and many courts to view tender agreements not as contracts, but as continuing offers to perform transportation services. *See, e.g., C. & H. Transp. Co. v. United States*, 193 Ct.Cl. 872, 875, 436 F.2d 480, 481 (1971); *Western Truck Lines, Ltd.*, 43 Comp.Gen. 54, 59 (1963).

In two recent cases in the United States Claims Court, tender agreements were characterized not as contracts, but as continuing offers on the part of the carrier to perform transportation services for stated prices. *Baggett Transp. Co. v. United States*, 23 Cl.Ct. 263, 265 (1991), *aff'd*, 969 F.2d 1028 (Fed.Cir.1992); *Pennco Trucking Inc. v. United States*, 20 Cl.Ct. 534, 537 (1990)). The courts in *Pennco* and *Baggett* were faced with the task of examining multiple tenders and deciding which one(s) permitted the shipper to bill for special services. The fact that in these two cases special services were ordered on a case-by-case basis, by annotations to the Government Bill of Lading filled in by the plaintiff, reinforces the non-contractual nature of these tenders, without the addition of a bill of lading.

In the past, tender agreements have focused primarily on achieving reduced rates pursuant to the Interstate Commerce Act, 49 U.S.C. § 10721 (1980), and frequently the government has enjoyed multiple tender agreements from which to choose. Also, in the past, the government did not generally promise to offer its requirements to (or honor a right of first refusal with) any one carrier, as was true in the case at bar.

The earlier cases cited above, however, did not address the question of whether a tender agreement must always be considered only a "continuing offer," or whether a tender agreement can be a contract (independent of the bill of lading) when all the elements of a contract are present. In the case at bar, the court is presented with precisely that issue.

While in the past, there has been support for the notion that tenders are continuing offers to perform transportation services, and that the bill of lading can be viewed as the basic transportation contract, the difficulty with that argument, as endorsed by the defendant, is that it implies that the mere invocation of 49 U.S.C. § 10721 as the source of authority for the tender agreement is enough to insulate tender agreements from judicial review as contracts.[6] This is particularly troubling when a tender agreement begins to take on the "look" and "feel" of a requirements contract. Therefore, more recently, both the General Accounting Office (GAO) and the Armed Forces Board of Contract Appeals (ASBCA) have recognized situations when tender agreements have risen to the level of requirements contracts.[7]

In *Port Arthur Towing Co.*, 89–3 B.C.A. (CCH) ¶ 22,004 at 110,630, 1989 WL 74396 (Armed Serv.B.C.A. May 17, 1989) (decision on jurisdiction), *appeal denied*, 90–2 B.C.A. (CCH) ¶ 22,857, 1990 WL 101360 (Armed Serv.B.C.A. April 12, 1990) (decision on merits), a case involving the MTMC, the same agency of the United States as in the case at bar, the ASBCA held that a tender agreement for transporting and storing aviation fuel was a requirements contract. In the Board's second decision, the decision on the merits (the first decision was on the issue of jurisdiction), the Board wrote: "We, of course, held in our 17 May 1989 decision that a contract did in fact come into existence." 90–2 B.C.A. (CCH) par. 22,857 at 114,820. The Board looked to a number of factors, including: 1) the transaction was for a twelve month period; 2) the agreement governed recurring move-

---

**6.** Individual claims, not the tender agreements themselves, are reviewable by the General Services Administration. In this context, a claim involves transportation charges based on a tariff or rate tender. 41 C.F.R. 101–41.6 (1991).

**7.** Although decisions of the Comptroller General and the Armed Services Board of Contract Appeals are not controlling in the United States Court of Federal Claims, the court may accord deference to those decisions in recognition of the GAO's and the ASBCA's special expertise.

ments over the long term, and not one-time, spot movements; 3) the procurement was accomplished using procedures similar to the FAR procedures; and, 4) the tender had all the indicia of a contract. The Board also found that: "... the GBLs in this tender are merely a part of the payment scheme. We know of no authority that prohibits the use of GBLs in conjunction with contracts. In fact, the government's own regulations contemplate that such may be the case. (Defense Traffic Management Regulation, AR 55–335, p. 175)." *Port Arthur Towing Co.*, 89–3 B.C.A. (CCH) ¶ 22,-004 at 110,630, 1989 WL 74396 (Armed Serv.B.C.A., May 17, 1989). Finally, the Board noted that the dispute in *Port Arthur* was not over GBL's or the correct movement of freight, but, rather, whether the contractor was entitled to payment for making transportation services available, which were not used. *Id.*

In yet another case involving the MTMC, the Comptroller General of the GAO reversed a prior dismissal of a protest, and, under the Competition in Contracting Act of 1984, accepted jurisdiction of a case regarding rate tender offers from a freight carrier, implicitly acknowledging that a rate tender offer under the MTMC's guaranteed traffic program could be reviewed as a requirements contract. *Federal Transport, Inc.*, 68 Comp.Gen. 451 (1989). *See also Georgetown R.R., Inc.*, 70 Comp. Gen. 70 (1990).

The facts in *Federal Transport* are decidedly similar to the instant case. In *Federal Transport*, MTMC solicited tenders through the issuance of a Request For Tenders (RFT) for transportation services at stated prices. The RFT stated that MTMC's actual requirements would be allocated to the responsive, responsible carrier whose offer conformed to the RFT, and was most advantageous to the government, cost and other factors considered. Alternate carriers were also selected. The term of the agreement was for 24 months. Any carrier could cancel the agreement with 30 days written notice, or the agreement could be cancelled in less than 30 days by mutual agreement. In differentiating between this type of tender agreement and one which utilizes GBLs to provide for one-time

routings, GAO found that not only does MTMC use provisions similar to the FAR and DFARs, but that all the indicia of a procurement are present in its guaranteed traffic program.

Further, unlike the issuance of GBLs, where MTMC merely selects a tender for a one-time routing without issuing any type of solicitation or conducting a formal source selection, all the indicia of a procurement are present in MTMC's guaranteed traffic program. MTMC issues a request for rate tenders which provides for award to the responsive, responsible carrier whose offer is most advantageous to the government, cost and other factors considered, for all the traffic for a particular route for a specific period of time. In response to the solicitation, MTMC receives rate tenders that are offers to perform transportation services at stated prices. After evaluation of offers, MTMC accepts the offer of a primary carrier and awards what is in effect a requirements contract to that carrier.

*Federal Transp., Inc.*, 68 Comp.Gen. 451, 453 (1989).

Later GAO decisions (also involving the MTMC), reemphasize that MTMC's program gives rise to what is, in effect, a requirements contract involving repetitive movements. *Georgetown R.R., Inc., Union Pac. R.R. & S. Pac. Transp.*, 70 Comp. Gen. 70 (1990); *Moody Bros. of Jacksonville, Inc.; Troika Int'l*, 69 Comp.Gen. 524 (1990).

The central question in the instant litigation, therefore, concerns the legal effect of a tender agreement that not only secures performance at lower rates for the government (as contemplated by 49 U.S.C. § 10721), but also extracts certain promises from the carrier, including its agreement to guarantee its availability to perform on a continuing basis, in return for which the government agrees to offer all its transportation requirements to stated destinations, to a single carrier, for a twenty-four month period.

■ Based on a review of the facts, the court finds that in the instant case the Tender Agreement signed by A–Transport was clearly more than just a continuing offer for basic transportation of goods, because the Tender Agreement set forth provisions directed at more than just basic transportation, such as loading requirements and standards for equipment and facilities and because both parties had agreed to binding performance obligations. To be sure, each time A–Transport moved perishables from one point to another, a Government Bill of Lading, which incorporated the Tender Agreement by reference, was filled out and issued by A–Transport. Nevertheless, when the invitation, the Tender Agreement, and the government's November 18, 1986 letter of acceptance are taken together, it is clear that the parties contemplated a continuing transportation services obligation over a two year period, and not merely authorization for a one-time offer for movement of freight from the point of origin to the point of destination. In the instant case, the government listed its estimated shipping requirements (quantities and destinations), and there was a reasonable expectation that A–Transport would provide transportation services for those requirements to the destinations specified for a fixed period of time. Moreover, nothing precludes using a tender agreement as the contract for continuing transportation services in conjunction with a bill of lading, when the GBL is used, for example, as a mechanism for payment or recordkeeping.[8]

It is important also to consider that A–Transport was promised a right of first refusal to provide continuing transportation requirements over a twenty-four month period in exchange for a promise to make vehicles available. The Tender Agreement itself contained language

which, at the very least, strongly discouraged optional use, and at most made optional use a practical impossibility. In addition, there was an absence in the Tender Agreement of a clear statement that it was not mandatory or binding on either party.

In the case at bar, MTMC's Tender Agreement indeed has the "look" and "feel" of a requirements contract.[9] MTMC issued a Request for Tenders (RFT), to be awarded to the responsive, responsible carrier, cost and other factors considered. The tender offers were treated, as described earlier, much like sealed bid procurements. The primary carrier was to be entitled to all available traffic based on military requirements for a set term (24 months), and the agreement covered repetitive freight, not one-time spot movements.

The particular Tender Agreement the government executed with plaintiff, A–Transport, was clearly more than just a vehicle to secure reduced transportation rates in accordance with the Motor Carrier Act of 1980 and ensuing regulations. The purpose of the Tender Agreement was to ensure carrier availability in that it required the responsible, responsive carrier(s) to provide satisfactory service for a 24 month period. Moreover, the Tender Agreement in the above captioned case had all the indicia of a FAR procurement. The government listed its estimated requirements and promised that the primary carrier would be entitled to them for the period of the tender. In its carrier acceptance letter, dated November 18, 1986, the government *required* carriers to provide satisfactory service for the period of the tender. Likewise, the government was *required* to make freight available at the loading dock within established timeframes. Except for an escalation provision in the event of a general rate increase, the carrier had to

**8.** It should be noted that current Federal Property Management Regulations (although not directly applicable to the Department of Defense) provide that contracts for transportation services can be used in conjunction with GBL's. *See* 41 C.F.R. § 101–40.403(e) (1991); 41 C.F.R. § 101–41.314–3 (1991).

**9.** To quote Mr. Justice Stewart, although in an obscenity case:

I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. *But I know it when I see it,* ... [Emphasis added].
*Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964).

promise that its rates would not exceed certain levels. The Tender Agreement itself used provisions patterned after FAR procurement clauses (Late Offers and Modifications or Withdrawals). Moreover, the Tender Agreement employed procurement concepts, also defined and/or discussed in the FAR, such as responsiveness and responsibility. The government even outlined a right to refer the carrier for proposed disqualification, similar to the suspension and debarment procedures used in the FAR.

█ Given the facts of the instant case, the defendant's argument that a contracting officer did not sign the agreement has no merit. Assuming the parties have the necessary authority to contract, plus consideration, and absent fraud, the necessary elements of a binding contract are offer and timely acceptance, without modification. If the parties enter into an agreement for carrier services which bears the signature of an authorized individual for plaintiff and defendant, it makes no difference whether the signature of the contracting officer is on the acceptance form. *Escote Mfg. Co. v. United States*, 144 Ct.Cl. 452, 458–59, 169 F.Supp. 483 (1959).

The Armed Services Board of Contract Appeals addressed this point in *Port Arthur:*

> The Government also points out that none of the Government employees involved in this tender had been appointed a contracting officer. Aside from FAR § 1.601, we know of no requirement that contracts be entered into by an employee with the title of contracting officer and the Government does not point us to any. Since FAR is not applicable to the tender, there was no requirement that it be entered into by a employee having been appointed a contracting officer. This is not to say that Government employees may enter into contracts without actual authority. The law is clear that Government employees must have actual authority for their actions. In this instance, there is no allegation that any of the Government employees took any unauthorized actions. Defense Traffic

Management Regulation 55–355 (Chapter 2) prescribes the policies and procedures and assigns responsibilities for the direction, control and supervision of all freight traffic management functions. This regulation specifically grants the Commander, MTMC and by delegation, Commander MTMCEA, the authority for the procurement and use of commercial freight transportation.

*Port Arthur Towing Co.*, 89–3 B.C.A. (CCH) ¶ 22,004 at 110,630, 1989 WL 74396 (Armed Serv.B.C.A. May 17, 1989).

In the instant case, as in *Port Arthur*, there is no allegation that any employee of the government has exceeded his/her authority. Moreover, there is no indication that the Chief of the Negotiations Division, Directorate of Inland Traffic, who signed the letter accepting A–Transport's tender in any way acted outside the scope of his assigned responsibilities.

The most telling indication that the Tender Agreement at issue in the instant case was indeed a requirements contract lies in the government's conduct. When it became clear to the government that the Tender Agreements, as written, no longer reflected the actual schedules, the government attempted to get all carriers to agree to a modification. Only A–Transport refused to sign. The government was, therefore, left with one Tender Agreement (A–Transport's) which did not reflect actual schedules. Consequently, the government chose to resolicit all the tenders.

Had the Tender Agreements been truly optional, there would have been no need to resolicit the tenders. If no contractual rights existed, the government could have ignored A–Transport's tender and given all traffic to the secondary carriers for A–Transport's route. The fact that the government felt compelled to resolicit the tenders is an indication that it recognized A–Transport's entitlement to all the identified traffic under the first Tender Agreement.

The parties also seem to acknowledge that pursuant to Item 18(d) of the Tender Agreement, the government had the right to resolicit the agreement as follows:

Should changing supply missions or requirements make it necessary for the Government to make distribution from a new supply point, those carriers selected under procedures outlined herein, will receive notice no less than thirty days in advance of such change, and will be invited to tender rates for their services under such new requirements as may be indicated on a competitive basis with other qualified carriers. The furnishing of thirty (30) days notice to the carrier(s) is not intended to apply to relocation of distribution points within the same commercial zone....

There is no disagreement that the movement of Seattle Cold Storage's warehouse to Algona meant that the government would be making distribution from a new supply point. Moreover, the government argued that it provided A–Transport with ample notice of the change of its supply depot, to the new warehouse in Algona, Washington, despite the fact that notice was required under Item 18(d) only if the move was to a different commercial zone, which plaintiff concedes it was not. The exception which allows the defendant not to notify the carriers if the relocation is within the same commercial zone, however, in no way restricts the government's ability to resolicit and invite new tender offers under appropriate circumstances.

The plaintiff, however, maintains that before the Tender Agreement could be resolicited, there must be a change in supply missions, or a change in requirements which mandated the government to distribute from a new supply point. The defendant, however, argues that the government need not demonstrate that a supply mission changed, or that the government's requirements changed, in order to resolicit the agreement. At the very least, the government maintains, the movement of the government's contractor (Seattle Cold Storage) to the Algona site forced changes in the pick-up and delivery schedules and that this constituted a change in supply mission or requirements, which made it necessary to make distribution from a new supply point.

The interpretation of a government contract is a matter of law. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 386, 351 F.2d 972, 974 (1965). The language of the contract must be given the meaning which would be derived from the contract by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Id.* at 388, 351 F.2d at 975. Only when the language of a contract is ambiguous will factors outside the contract terms be taken into account. *See Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972). A contract is unambiguous when it is reasonably open to only one interpretation. *Shearson Lehman Hutton, Inc. v. United States*, 24 Cl.Ct. 770, 773 (1991), *aff'd* (Fed. Cir.1992); *Framlau Corp. v. United States*, 215 Ct.Cl. 185, 194, 568 F.2d 687, 692 (1977). Moreover, the fact that the parties disagree as to the meaning of a contract provision does not necessarily render that provision ambiguous. *Shearson Lehman Hutton*, 24 Cl.Ct. at 773; *Cherry Hill Sand & Gravel Co. v. United States*, 8 Cl.Ct. 757, 764 (1985); *Perry & Wallis*, 192 Ct.Cl. 310, at 315, 427 F.2d 722, at 725; *Southern Constr. Co. v. United States*, 176 Ct.Cl. 1339, 1361, 364 F.2d 439, 453 (1966). When interpreting the language of a contract, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *Fortec Constructors*, 760 F.2d at 1292; *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983).

The interpretation of Item 18(d) that the plaintiff would have us adopt is that the *only* condition for resolicitation should be a change in supply mission or requirements, and that merely a change in supply point is not sufficient. We believe that this interpretation strains the meaning and intent of the Tender Agreement when read as a whole.

It is clear that what the government bargained for was to be able to require carriers to provide satisfactory service for a twenty-four month period. The govern-

ment also wanted to be able to rely primarily, if not exclusively, on the lowest cost carrier for each route. However, the Tender Agreement also recognized the possibility of changed circumstances. Thus, some flexibility was built into the agreement to accommodate unforeseen events. Hence, carriers could decline individual loads and cancel individual routes. To discourage carriers from abusing the options of declining loads or giving up routes, the government could terminate the agreement for unsatisfactory performance. Likewise, if a carrier gave up routes, the government could cancel a tender in its entirety. The government could change the schedule with reasonable advanced notice. Under certain conditions, the government could assist in loading the trucks. There also was a provision to escalate the rates, if warranted, and the tender could be amended by mutual agreement.

A proper reading of Item 18(d) of the Tender Agreement should take into consideration the bargained for considerations to which both parties were entitled pursuant to the Tender Agreement. Item 18(d), by its terms, allows for the flexibility to resolicit if changes in the supply missions or requirements occurred, and the agreement can easily be interpreted to include the relocation of the supply point as one such change. Nowhere in the document are the terms "supply mission" and "requirements" defined. Nor is there any indication that the parties intended a meaning more specific than what would be construed by a reasonable person reading Item 18(d). In short, there is nothing in the document which would either require or preclude the move of the government's warehouse from being considered a change in "supply mission" or "requirements." The court, therefore, finds that the terms of the contract clearly allowed the government to conclude that it was entitled to resolicit the carrier agreements when the supply point changed.

While Item 18(d) gave the government the right to terminate the Tender Agreement upon the relocation of the supply point, the right to terminate a govern-ment contract is not absolute. Termination of a contract for convenience is valid only in the absence of bad faith or a clear abuse of discretion. *Torncello v. United States*, 231 Ct.Cl. at 51; 681 F.2d at 770 (concurring opinion); *National Factors, Inc. v. United States*, 204 Ct.Cl. 98, 103, 492 F.2d 1383, 1385 (1974).

In the absence of clear evidence to the contrary, however, it must be presumed that the government acted in good faith in effecting the termination. *Librach v. United States*, 147 Ct.Cl. 605 (1959); *Torncello*, 231 Ct.Cl. at 45, 681 F.2d at 770. Since good faith is presumed, the plaintiff bears an extremely heavy burden of proving the contrary, and the government is prevented only from engaging in actions motivated by a specific intent to harm the plaintiff. *Id.* at 45, 681 F.2d at 770. The difficult burden of proof for a plaintiff attempting to show "government bad faith" has been outlined as follows:

[i]t requires 'well-nigh irrefragable proof' to induce the court to abandon the presumption of good faith dealing. *Knotts v. United States*, 121 F.Supp. 630, 631, 128 Ct.Cl. 489, 492 (1954).

In the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some *specific intent to injure the plaintiff.* Thus, in *Gadsden v. United States*, 78 F.Supp. 126, 127, 111 Ct.Cl. 487, 489–90 (1948), the court compared bad faith to actions which are 'motivated alone by malice.' In *Knotts, supra*, at 128 Ct.Cl. 500, 121 F.Supp. 636, the court found bad faith in a civilian pay suit only in view of a proven 'conspiracy * * * to get rid of plaintiff.' Similarly, the court in *Struck Constr. Co. v. United States*, 96 Ct.Cl. 186, 222 (1942) found bad faith when confronted by a course of Governmental conduct which was 'designedly oppressive.' But in *Librach, supra*, at 147 Ct.Cl. 614, the court found no bad faith because the officials involved were not 'actuated by animus toward the plaintiff.' (Emphasis in original).

*Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 198–99, 543 F.2d 1298, 1301–02 (1976), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). *See also Torncello,* 231 Ct.Cl. 20, 45, 681 F.2d 756, 770–71 (1982).

In *DeClerk & Associates, Inc. v. United States,* 26 Cl.Ct. 35, 42 (1992), this court stated a test for whether the government actions are to be considered arbitrary and capricious. This court drew its guidance from the court in *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203–4 (1974):

> In *Keco (II),* the court set forth four factors to be considered when determining whether the government acted arbitrarily or capriciously towards the bidder-claimant: 1) whether the government procuring officials acted in bad faith, thus depriving the bidder of fair and honest consideration of its proposal; 2) whether there was a reasonable basis for the government's decision; 3) the degree of discretion given to the procurement officials by applicable statutes and regulations; 4) whether government officials violated pertinent statutes or regulations, which, if violated, may form the basis for recovery, but which need not automatically constitute grounds for recovery. *Keco (II),* 203 Ct.Cl. at 574, 492 F.2d at 1203–04.

*DeClerk & Assocs., Inc. v. United States,* 26 Cl.Ct. 35, 42 (1992).

■■■ The record in the instant case reveals some dissatisfaction on the part of the government with A–Transport's performance, and more than a little frustration at their inability to negotiate a modification to the Tender Agreement with A–Transport, which would reflect actual schedules, to conform with the changed supply point. The government's conduct, however, falls short of what would be necessary to demonstrate bad faith. The government decided to resolicit the Tender Agreement only after extended negotiations with A–Transport, and only after coming to an impasse on an acceptable modification to the Tender

Agreement. Despite the fact that A–Transport continued to perform in accordance with revised schedules, the company never "accepted" the revisions, and in its letter to the government, dated February 12, 1987, even rescinded acceptance of certain revisions it had earlier accepted. When it became clear that an agreement to modify the Tender Agreement would not be possible with A–Transport,[10] the government was left with the options of 1) operating with a tender which did not reflect actual conditions, or 2) resoliciting the agreements. Given this choice, the government's decision to resolicit the Tender Agreement was not unreasonable.

If the government's purpose, when it resolicited the tender, was to stop doing business with A–Transport, this is not borne out by the facts. A–Transport was invited to bid on the resolicitation, which, in fact, even gave the carrier an opportunity to increase the number of routes it held. The resolicitation also gave A–Transport a chance to evaluate the new schedules and to bid accordingly. Thus, if a delivery schedule seemed too restrictive, or a route too unprofitable, A–Transport could offer higher rates, or not offer for that route. After the resolicitation, A–Transport lost a net of five destinations. Nevertheless, it was awarded more routes than any other carrier under the resolicitation. The government's intent was to obtain a workable tender, which accurately reflected delivery schedules, at rates mutually agreed upon by all parties. The record does not demonstrate specific intent to injure the plaintiff, nor did the government actions appear to be motivated by malice.

Beyond the pleadings, the plaintiff has advanced little or no evidence to show bad faith, lack of reasonable basis, abuse of discretion, or violation(s) of law or regulations on the part of the government. A–Transport entered into an enforceable requirements contract with the government to provide transportation services in the Seattle area. When the government's supply point moved, however, the government

---

**10.** Out of six carriers, A–Transport was the only carrier with which the government was unable to renegotiate the Tender Agreement. However, when the government resolicited, those five other carriers were also forced to rebid their tender agreements.

was entitled to resolicit the contract to reflect actual conditions. The government's actions were reasonable under the circumstances, were not motivated by bad faith, and were not arbitrary or capricious. For the reasons stated above, the court, hereby, GRANTS the defendant's cross-motion for summary judgment. The plaintiff's motion for partial summary judgment is, therefore, DENIED. The Clerk of the Court is ordered to enter judgment in accordance with this Opinion.

IT IS SO ORDERED.