**A–TRANSPORT NORTHWEST CO., INC., Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 93–5072.

United States Court of Appeals, Federal Circuit.

Oct. 4, 1994.

Ken W. Hart, Casey & Pruzan, Seattle, WA, argued, for plaintiff-appellant. With him on the brief was Michael A. Larson.

Elizabeth A. Cavendish, U.S. Dept. of Justice, Washington, DC, argued, for defendant-appellee. With her on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director and James M. Kinsella, Asst. Director.

Before RICH, MICHEL, and PLAGER, Circuit Judges.

PLAGER, Circuit Judge.

This is a government contract case involving the issue of whether the Government's resolicitation of tenders for transportation services breached an existing contract with a carrier. A–Transport Northwest Co. (A–Transport) appeals the judgment of the Court of Federal Claims (CFC)[1], entered November 30, 1992, granting summary judgment in favor of the Government. *A–Transport Northwest Co., Inc. v. United States,* 27 Fed.Cl. 206 (1992). We affirm.

## BACKGROUND

A–Transport was a trucking firm based in the Seattle, Washington area.[2] By way of a letter and related materials dated July 1, 1986, the Government, acting through the Military Traffic Management Command (MTMC) and the Defense Logistics Agency (DLA) (hereafter collectively the Government), solicited tenders from A–Transport and other Seattle-based trucking firms for the transport of perishable goods from a warehouse owned by Seattle Cold Storage (SCS), and located in Seattle, Washington, to various government facilities in Washington, Oregon, Idaho, Montana, and California.[3]

The solicitation called for the tenders to be effective for the period January 1, 1987 through December 31, 1988. The solicitation included an unexecuted Perishable Subsistence Carrier Rate Tender and Service Agreement (Tender Agreement or Agreement) to be executed by the contractor upon submission of a tender. The Tender Agreement specified the terms and conditions under which services were to be provided to the Government. Included was Item 28, a schedule of rates for the transportation of perishable goods from the SCS warehouse in Seattle to various Government installations, and Item 29, a corresponding loading and delivery schedule. Also included was Item 18(d), in which the Government reserved the right to change under certain conditions the prescribed distribution point:·

> Should changing supply missions or requirements make it necessary for the Government to make distribution from a new supply point, those carriers selected under procedures outlined herein, will receive notice no less than thirty days in advance of such change, and will be invited to tender rates for their services under such new requirements as may be indicated on a competitive basis with other qualified carriers. The furnishing of thirty (30) days notice to the carrier(s) is not intended to apply to relocation of distribution points within the same commercial zone.

A–Transport signed the Tender Agreement on July 31, 1986, and submitted the signed document to the Government.

Before making the final selection of carriers which had submitted tenders, the Government notified the carriers that the prescribed distribution point in Seattle had been changed. The change was prompted by SCS's decision to move its warehouse approximately 25 miles to Algona, Washington, a suburb of Seattle. The Government also

---

1. The Claims Court was renamed the Court of Federal Claims pursuant to § 902 of the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506, 4516 (1992), effective October 29, 1992.

2. That company is apparently no longer in the trucking business.

3. MTMC and DLA are charged with the responsibility of procuring interstate freight transportation services for the government pursuant to the Interstate Commerce Act, as amended, 49 U.S.C. § 10721 (1988). Resulting agreements are exempt from the Federal Acquisition Regulations (FAR). *See* 48 C.F.R. § 47.200(b)(2)–(3) (1993).

notified the carriers that because the new location was still within the Seattle 'commercial zone,'[4] no increase in rates would be authorized.

Thereafter, by means of letters dated November 16, 1986,[5] the Government notified those carriers whose tenders had been accepted. Each route specified in the Tender Agreement was assigned a primary carrier and one or more secondary carriers. A–Transport was awarded more routes as primary carrier—23—than any other carrier.

Since Item 29 of the Tender Agreement—the loading and delivery schedule—did not reflect the Algona distribution point, the DLA, in a letter dated November 26, 1986, proposed, subject to final approval by the MTMC, that all carriers, including A–Transport, agree to a modified loading and delivery schedule which reflected that point. No increase in costs were mentioned. Although it expressed some reservations, A–Transport agreed to the requested modifications.

In a letter dated January 29, 1987, the DLA asked A–Transport to agree to additional modifications to the loading and delivery schedule, again with no cost increase. This time, A–Transport refused to agree. Moreover, in a letter dated February 12, 1987, it rescinded its acceptance of the earlier schedule revisions, and outlined the specific changes and conditions the company would find acceptable.

The Government then considered whether to resolicit tenders for the services required. This option was not immediately pursued, however, because the DLA and MTMC were not in agreement on how to proceed. The DLA wanted to resolicit tenders; MTMC wanted to continue efforts to persuade the contractors, including A–Transport, to agree to the revised schedule without an increase in rates. Eventually all the remaining primary carriers involved agreed to the proposed revisions except A–Transport.

At this point, the Government decided to pursue the resolicitation option. Accordingly, by means of a letter and associated materials dated August 18, 1987, the Government resolicited the tender. Invitations were sent to all existing contractors, including A–Transport. The Government stated that the resolicitation was being conducted because of the unacceptability to existing carriers of proposed modifications to the loading and delivery schedule. It was also specified that the new tenders were to be effective for the fourteen-month period extending from November 1, 1987 through December 31, 1988, and would be subject to a revised loading and delivery schedule appropriate for the Algona distribution point.

By letter dated October 23, 1987, the Government notified those carriers which had been selected in connection with the resolicitation. In that letter, the Government also revoked all prior tenders and rankings for the Seattle area. Although A–Transport was once again awarded more routes as primary carrier than any other carrier—18—it had a net loss as primary carrier of five routes.

Subsequently, A–Transport submitted a claim for lost profits on the theory that the Government breached the Tender Agreement by its resolicitation activities. The Government responded stating that this conduct was authorized by Item 18(d) of the Tender Agreement. As the Government explained to A–Transport's attorney:

[I]tem 18d specifically provides that, "Should changing supply missions or *requirements* make it necessary for the Government to make distribution from a *new supply point*, those carriers selected under procedures outlined herein, will receive notice *no less than thirty days* in advance of such change, and will be invited to tender rates for their services under such new requirements as may be indicated on a competitive basis with other qualified carriers." (Emphasis supplied).

4. That term is defined by the Interstate Commerce Commission (ICC).

5. There is some question in the record regarding the date of the letters. The trial court concluded that the letters were sent November 16, 1986.

27 Fed.Cl. at 210. A letter attested to by plaintiffs as constituting the government's notification of the selected carriers is dated November 18, 1986.

We advised your client, more than 30 days in advance, that the warehouse would be relocated. We advised that due to the requested move there would be a change in scheduling (item 29) and requested agreement to this modification. A–Transport refused to sign this agreement thus contributing to the necessity of a resolicitation of rates/charges from the new location. . . .

This resolicitation is fully and properly justified under general procurement law and specifically authorized by the provisions of the tender and we find no merit to your claim. (Emphasis in original).

A–Transport responded in a letter dated May 24, 1988. In that letter, A–Transport characterized the Government's justification for the resolicitation—the failure of A–Transport to agree to the proposed modifications to the loading and delivery schedule (Item 29)—as a sham. It further charged the Government with bad faith on the theory that the Government was in fact using the resolicitation as a pretext to eliminate A–Transport as a government contractor:

[T]he tender does not require carriers to agree with item 29 modifications. The government is authorized to unilaterally modify item 29 without approval by carriers. Finally, all previous communications to A–Transport stated that the resolicitation of the tender was the result of "unacceptability" of modifications to Item 29 of the tender, *not* changes in the supply point.

\* \* \* \* \* \*

. . . . The DLA has repeatedly altered its reasons for resolicitation of the tender. It appears there has been a concerted effort to eliminate A–Transport as a government contractor by whatever means available.

The Government responded to the charge of bad faith in a letter dated June 7, 1988, explaining that although not required by the Tender Agreement, it sought A–Transport's acceptance of the proposed modifications to Item 29 of the Agreement because that was "good business practice." It also disputed A–Transport's claim that it had repeatedly changed the reasons for the resolicitation. As the Government explained:

The reasons for the resolicitation of the new tender have always been the same, they being, the movement to a new supply point and the failure of [A–Transport] to agree to the terms of item 29. The [DLA] specifically addressed this. . . . (See your April 26 letter, page 3, in which you cite the same thing under the third modification.) Thus, A–Transport had full knowledge of the relocation of the Seattle Cold Storage and the reasons for the resolicitation.

Finally, the Government responded to A–Transport's charge that the resolicitation was a pretext to eliminate A–Transport as a government contractor. According to the Government, "A–Transport has neither been terminated nor disqualified in the past, has been afforded the opportunity to quote on present requirements, and has been awarded and is participating in current traffic movements."

On March 14, 1990, A–Transport filed a complaint in the CFC, asserting that the Government had no authority to resolicit tenders for the Seattle area. The parties then filed cross-motions for summary judgment. On November 25, 1992, the court, in the decision that gave rise to this appeal, issued an opinion granting the Government's motion and dismissing appellant's complaint.

The trial court viewed the issues as three: "whether the Tender Agreement was an enforceable contract; whether the Government's resolicitation of the agreement was permissible within the terms of the agreement; and, whether by resoliciting the agreement, the government acted in bad faith." 27 Fed.Cl. at 213–14. In relation to the first issue, the court considered whether the Tender Agreement was, as A–Transport maintained, a requirements contract, or, as the Government maintained, a continuing offer by A–Transport to perform transportation services. Citing *Port Arthur Towing Co.*, 89–3 B.C.A. (CCH) ¶ 22,004 at 110,630 (Armed Serv. B.C.A. May 17, 1989) (decision on jurisdiction), *appeal denied*, 90–2 B.C.A. (CCH) ¶ 22,857 (Armed Serv. B.C.A. April 12, 1990) (decision on merits) and *Federal Transport, Inc.*, 68 Comp.Gen. 451 (1989), the court, focusing on the length of time (24

months) the Tender Agreement was intended to be effective, concluded that the Tender Agreement was an enforceable requirements contract. 27 Fed.Cl. at 217.

Regarding the second issue, the court considered whether the move of the SCS warehouse to Algona constituted a change in "supply missions or requirements" as required by Item 18(d) of the Tender Agreement. In concluding that it did, the court focused on the plain meaning of the language in question:

> [T]here is nothing in the [Tender Agreement] which would either require or preclude the move of the government's warehouse from being considered a change in 'supply mission' or 'requirements.' The court, therefore, finds that the terms of the contract clearly allowed the government to conclude that it was entitled to resolicit the carrier agreements when the supply point changed.
>
> 27 Fed.Cl. at 220.

In relation to the third issue, the court, citing *Torncello v. United States*, 681 F.2d 756, 231 Ct.Cl. 20 (1982), determined that the Government's right to terminate the Tender Agreement, although authorized by Item 18(d), was not absolute. As the court put it, "[t]ermination of a contract for convenience is valid only in the absence of bad faith or a clear abuse of discretion." 27 Fed.Cl. at 220. In determining whether A–Transport had made the necessary showing of bad faith, the court noted that the Government was entitled to a presumption that it acted in good faith, and that the burden fell upon A–Transport to clearly rebut this presumption. 27 Fed.Cl. at 220–21. In light of the impasse the Government had reached in its attempt

to renegotiate the Tender Agreement with A–Transport, and the untenable position faced by the Government of operating under a tender which did not reflect the new supply point, the court concluded that A–Transport had not shown that the Government's decision to resolicit tenders was unreasonable. 27 Fed.Cl. at 221–22.

On November 30, 1992, summary judgment was entered in favor of the Government. This appeal followed.

## DISCUSSION

### A.

The appellant raises two issues. First, whether the Government's resolicitation activity was authorized by the "supply missions or requirements" language of Item 18(d) of the Tender Agreement. Second, assuming it was, whether the court improperly failed to draw the justifiable and necessary inference that the resolicitation was conducted by the Government in bad faith.[6]

Before addressing these issues, it is necessary to resolve the threshold question of whether the Tender Agreement constituted a binding contract between the parties.[7] This being a question of law, *see Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985); *Hol-gar Mfg. Corp. v. United States*, 351 F.2d 972, 974, 169 Ct.Cl. 384 (1965), we are free to undertake a complete and independent analysis of it. *See Trayco v. United States*, 994 F.2d 832, 835 (Fed.Cir.1993).

The Government argues that the Tender Agreement is best characterized as a continuing offer on the part of A–Transport to perform transportation services under the

---

**6.** The third issue which A–Transport purports to raise on appeal—whether the court failed to draw all reasonable inferences in favor of nonmovant A–Transport—is merely a restatement of the second issue.

**7.** This issue has been raised by the Government in its brief in response to A–Transport's appeal. At oral argument, A–Transport raised the question of the propriety of our reaching this issue in view of the Government's failure to file a cross-appeal. The general rule is that "[a] prevailing party need not cross-petition to defend a judgment on any ground properly raised below, so

long as that party seeks to preserve, and not to change, the judgment." *Northwest Airlines, Inc. v. County of Kent, Michigan*, —— U.S. ——, ——, 114 S.Ct. 855, 862, 127 L.Ed.2d 183 (1994); *see also Genentech, Inc. v. The Wellcome Found. Ltd.*, 29 F.3d 1555, 1561–62, 31 USPQ2d 1161, 1165 (Fed.Cir.1994) (quoting *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 731 F.2d 840, 843, 221 USPQ 657, 660 (Fed.Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 62 (1984)). Since a decision on this issue in favor of the Government would not result in an alteration of the judgment, the Government is free to raise it on appeal.

terms stated. According to the Government, such an offer can only be accepted by the Government when a bill of lading for a specific shipment is prepared. To support its argument, the Government points to a purported lack of detailed procedures, such as those contained in the Federal Acquisition Regulations (FAR), for establishing and enforcing agreements such as this, a purported absence in the Agreement of many of the traditional indicia of government contracts, and a purported lack of mutuality of obligation.

A–Transport, by contrast, argues that the Tender Agreement is properly characterized as a binding requirements contract in which the Government's obligation to satisfy its requirements exclusively from the selected carriers provided the necessary mutuality of consideration.

On the facts of this case A–Transport is correct. The materials sent to A–Transport in July of 1986 as part of the Government's solicitation efforts included the unexecuted Tender Agreement. The materials were plainly an invitation for the carrier to bid, i.e., submit a tender, for the prescribed services. According to the cover letter accompanying the unexecuted Agreement: "This is your invitation to submit rates for line haul movements of perishable subsistence for the period 1 January 1987 through 31 December 1988." Item 31(a) of the Agreement establishes that A–Transport, by signing the agreement, offers to provide "the transportation services herein described on a continuing basis for the period shown on the title page of this Tender [January 1, 1987 through December 31, 1988], subject to the rates and charges, rules and provisions herein. . . ."

At this point, the Government was empowered to create a contract by accepting A–Transport's offer. This it did in November 1986, when it notified those carriers whose tenders had been accepted. At this point a contract was formed between the Government and A–Transport.

The Government's argument, that the execution of the Agreement was a continuing offer on the part of A–Transport which was not accepted by the Government until the individual bills of lading for the specific ship-

ments were prepared, is incorrect. Acceptance here occurred much earlier than that—when the Government communicated its selection of carriers for the specific routes and installations. The execution of the bills of lading may give rise to additional contractual obligations binding on the parties, but if so that has no bearing on the issue of whether the Government's communication of its selection of tenders itself gave rise to contractual obligations.

The Government's other point, that there was a lack of mutuality of consideration, is also unavailing. Item 31(d) of the Agreement obligates the Government to satisfy its requirements exclusively from the selected carriers: "I (we) understand that those carriers selected shall be entitled to *all* available traffic based on military requirements for the period of this Tender. . . ." (Emphasis added). The Agreement is thus a conventional requirements contract, in which an obligation of exclusivity is recognized as sufficient consideration to satisfy the requirement of mutuality of consideration. *Torncello v. United States*, 681 F.2d 756, 761, 231 Ct.Cl. 20 (1982). The Government is incorrect that there was a lack of mutuality of consideration.

The Government's third point, that there is a lack of the traditional indicia of a government contract, as well as detailed regulations such as FAR governing the procurement, is also unavailing. For one thing, the procurement was accomplished through formal procedures not unlike those of FAR. For another, the dispositive issue is whether there was an 'offer' and an 'acceptance,' i.e., a meeting of the minds from an objective standpoint, supported by mutuality of consideration, *Restatement (Second) of Contracts* § 17, at 51–52 (1979), and not whether every conceivable detail had been spelled out in the contract. We conclude that there was a valid and binding contract.

Our conclusion finds support in *Port Arthur Towing Co.*, 89–3 B.C.A. (CCH) ¶ 22,204 at 110,630 (Armed Serv. B.C.A. May 17, 1989) (decision on jurisdiction), *appeal denied*, 90–2 B.C.A. (CCH) ¶ 22,857 (Armed Serv. B.C.A. April 12, 1990) (decision on mer-

its) and *Federal Transport, Inc.*, 68 Comp. Gen. 451 (1989). In *Port Arthur*, a claim against the Government was brought before the Armed Services Board of Contract Appeals (Board) for the cost of transportation services which had been tendered using a standard Department of Defense form. The Government had moved to dismiss for lack of jurisdiction, arguing that "traditionally the [government bill of lading (GBL) ] is considered the contract and since a GBL is not an acquisition under the normal Government procurement system, neither the [Government Accounting Office (GAO) ]` nor [the Board] have subject matter jurisdiction over the matter." 89–3 B.C.A. ¶ 22,004, at 110,- 629. The Board, distinguishing the cases relied on by the Government, rejected the Government's argument. According to the Board, those cases "[involved] spot movements accomplished through GBLs." *Id.* In the present case, by contrast, said the Board, the tender was "for a 12–month period and contains flat monthly rates for specific equipment." *Id.* Moreover, said the Board, the formality of the procedures followed in conducting the procurement was inconsistent with the notion that a contract did not come into existence: "[t]he procurement was accomplished using procedures similar to the FAR procedures, the tender has all the indicia of a contract and appears to us to be a type of requirements contract." *Id.* (citations omitted). Finally, the Board rejected the argument that because GBLs were involved in the transaction, they represented the sole contract between the parties. As the Board explained:

> We find no merit in the Government's argument that because GBLs are involved in this appeal, they represent the contract and we have no jurisdiction. Far from the case in one-time spot movements where GBLs are issued ... and represent the contract, the GBLs in this tender are merely part of the payment scheme. We know of no authority that prohibits the use of GBLs in conjunction with contracts.

*Id.* at 110, 629–630.

The Board ultimately denied the Government's motion, concluding that the tender resulted in a contract over which it had jurisdiction. When it addressed the appeal on the merits, the Board reaffirmed this characterization of the procurement: "We, of course, held in our 17 May 1989 decision that a contract did in fact come into existence." 90–2 BCA ¶ 22,857, at 114,820.

In *Federal Transport*, Federal Transport, Inc. had filed with the General Accounting Office (GAO) a protest challenging the decision of the MTMC allowing a third party to correct a mistake in its tender. 68 Comp. Gen. 451. That tender had been sent to Federal Transport in a request for tenders (RFT) for certain transportation services. *Id.* Federal Transport had been awarded primary or first alternate status for several regions, and as a consequence of the decision, it lost that status. *Id.* GAO had dismissed the protest as outside its jurisdiction in part because "the negotiations for the rate tender did not result in a contract; and the document used to obtain the actual transportation would be a government bill of lading (GBL)." *Id.* On Federal Transport's motion for reconsideration, the GAO reversed its decision, concluding that the negotiations did in fact result in a contract over which it had jurisdiction. *Id.* at 453. As the GAO explained:

> [U]nlike the issuance of GBLs, where MTMC merely selects a tender for a one-time routing without issuing any type of solicitation or conducting a formal source selection, all the indicia of a procurement are present.... MTMC issues a request for rate tenders which provides for award to the responsive, responsible carrier whose offer is most advantageous to the government, cost and other factors considered, for all the traffic for a particular route for a specific period of time. In response to the solicitation, MTMC receives rate tenders that are offers to perform transportation services at stated prices. After evaluation of offers, MTMC accepts the offer of a primary carrier and awards what is in effect a requirements contract to that carrier.

*Id.*

The cases cited by the Government— *Southern Pacific Transportation Co. v. Commercial Metals Co.*, 456 U.S. 336, 102 S.Ct. 1815, 72 L.Ed.2d 114 (1982); *C & H Trans-*

*portation Co. v. United States,* 436 F.2d 480, 193 Ct.Cl. 872 (1971); *Baggett Transportation Co. v. United States,* 23 Cl.Ct. 263 (1991), *aff'd,* 969 F.2d 1028 (Fed.Cir.1992); and *Pennco Trucking Inc. v. United States,* 20 Cl.Ct. 534 (1990)—are not to the contrary. All these cases are distinguishable because none addressed the question of whether the Government's selection of tenders pursuant to a formal procurement process could itself give rise to contractual obligations on the part of the Government. Furthermore, when viewed in context, the language in these cases relied on by the Government does not support its assertion that the bill of lading is the exclusive means in the transportation context of accepting a tender. When properly viewed, this language simply stands for the proposition that a tender for transportation services is normally accepted through the issuance of a bill of lading.

In *Southern Pacific,* the issue in the case was whether a common carrier's violation of credit regulations issued by the Interstate Commerce Commission (ICC) barred the carrier's collection of a lawful freight charge from a shipper-consignor who, under the terms of the shipment's bill of lading, was primarily liable for the charge. 456 U.S. at 337, 102 S.Ct. at 1817. The point of the language in question—the Court's characterization of the bill of lading as "the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers," 456 U.S. at 342, 102 S.Ct. at 1820 (quoting *Texas & Pacific R.R. v. Leatherwood,* 250 U.S. 478, 481, 39 S.Ct. 517, 518, 63 L.Ed. 1096 (1919))—was simply to point out the significance of the shipper's failure to exonerate itself from liability through appropriate terms in the bill of lading. The Court did not purport to characterize the bill of lading as the exclusive means of creating a contract.

In *C & H,* the issue was whether provisions in a tariff on file with the ICC applied to a shipment made pursuant to a tender submitted to the Government before the tariff had become effective. 436 F.2d at 481–82. The purpose of the language in question— the court's characterization of a tender and

its supplements as "continuing offers by the plaintiff to ship goods for the Government in accordance with the provisions of various tenders," 436 F.2d at 480—was simply to point out why the tariff in question was not incorporated into the tender submitted by the carrier, and thus could not be part of the contract between the parties. The court did not purport to limit the means by which the tender could be accepted.

*Baggett* was a consolidation of four cases involving the issue of whether the Government was liable for additional "exclusive use" charges on the basis of certain notations made by it on the bills of lading under which the shipments in question moved, or on the basis of the Government's use of non-standard locks in connection with the shipments. 23 Cl.Ct. at 270–71. The trial court found that the Government was not liable to two of the carriers. *Id.* at 275–76. Those two carriers appealed. The sole issue on appeal was whether the Government had through its conduct requested "exclusive use" services from the carriers. 969 F.2d at 1029. Here, the purpose of the language in question—the trial court's statement that the overall contractual relationship between the parties is defined by "the tender and incorporated tariff, representing the offer, and the GBL and its annotations, representing the acceptance," 23 Cl.Ct. at 271, and this court's statement that "the 'tender' is the carrier's continuing offer to perform transportation services for the stated prices; … the government bill of lading is the document by which the government accepts the carrier's services …," 969 F.2d at 1029—was simply to point out how the government's behavior in notating bills of lading could give rise to contractual obligations. We, as well as the trial court, did not purport to characterize the bill of lading as the exclusive means by which the government could become bound.

*Pennco* as well involved the question of whether the Government was liable to a carrier for additional "special services" charges. 20 Cl.Ct. at 535. Resolution of that question involved the subsidiary issues of which tenders governed the shipments in question, and whether the Government, through certain notations it had made to the bills of lading

under which the shipments moved, had adequately requested the "special services." *Id.* at 537. The point of the language in question—the court's characterization of a tender as "a continuing offer to perform transportation services for stated prices.... [which] gave [the government] the power to make a series of separate contracts by a series of independent acceptances," 20 Cl.Ct. at 537— was simply to respond to the carrier's contention that a tender had been revoked. The court pointed out that the tender was an offer which could only be revoked through a communication received by the offeree. 20 Cl.Ct. at 537. The court did not purport to limit the means by which the offer represented by the tender could be accepted.

When viewed in the context of the cases, the language used by the courts confirms the general proposition that a tender for transportation services is normally completed through the issuance of a bill of lading. These cases do not purport to make a definitive statement about when a tender can become a binding contract on the parties. We conclude that on the facts of this case, the Government's selection of A–Transport gave rise to a binding contract between them.

### B.

#### 1.

■ Having completed our treatment of the threshold issue, we consider in order the issues raised by A–Transport. In relation to the first issue, A–Transport argues the resolicitation was prompted by the unilateral decision of a third party, SCS, to relocate its warehouse to Algona, and that as such it is not embraced by the "supply missions or requirements" language of Item 18(d) of the Tender Agreement.

■ When provisions in a contract are clear and fit the case, they should be given their plain and ordinary meaning. *Triax–Pacific v. Stone*, 958 F.2d 351, 354 (Fed.Cir. 1992) (citing *George Hyman Const. Co. v. United States*, 832 F.2d 574, 579 (Fed.Cir. 1987)). Based on our review of the record, we think the ordinary meaning of the phrase

includes a change in supply point prompted by a third party's unilateral relocation decision.

A–Transport's argument is premised on the notion that the phrase is limited to changes which are triggered by some event internal to the Government. We cannot agree. As the Government points out, that interpretation excludes activity which Item 18(d) was clearly intended to embrace, such as changes in delivery schedules or requirements triggered by unilateral acts of foreign governments. Thus, we do not consider A–Transport's interpretation to be a reasonable one.

■ A–Transport's alternative argument—that the phrase is ambiguous and should be construed against the Government—also fails. A contract is ambiguous only when it is susceptible to two reasonable interpretations. *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed.Cir. 1986). As noted, the interpretation proffered by A–Transport is unreasonable.

A–Transport's final point—that an interpretation of Item 18(d) which embraces the relocation of SCS's warehouse would cover all changes in supply point and thus render the phrase "supply missions or requirements" superfluous—is not persuasive. A reasonable interpretation of Item 18(d) which embraces the relocation of SCS's warehouse and gives meaning to the phrase "changing supply missions or requirements" focuses on the word "necessary" appearing in Item 18(d)—changes in supply point which are unnecessary for the purpose of fulfilling changing supply missions or requirements are excluded from coverage.

Accordingly, we conclude the resolicitation was authorized by Item 18(d) of the Agreement.[8]

#### 2.

■ A–Transport next argues that there is a disputed issue of material fact regarding the Government's motive in resoliciting the tender. According to A–Transport, the issue

---

8. We thus do not need to reach the Government's argument that the resolicitation was authorized

by an implied termination for convenience clause that was incorporated into the Agreement.

of whether the Government acted in bad faith, i.e., impermissibly used the resolicitation as a pretext to eliminate A–Transport as a contractor, is a triable one, and thus the trial court acted improvidently when it granted summary judgment in the Government's favor on the issue.

The Government by contrast asserts that A–Transport has proffered no *evidence* to support its theory and thus has not rebutted the presumption that the Government acted in good faith. As a result, according to the Government, there is no genuine dispute regarding the issue, and the trial court thus did not err in granting summary judgment in the Government's favor.

For purposes of our analysis, we assume the Government has the obligation of good faith as urged by A–Transport. Even so, A–Transport has made an inadequate showing on the issue of the Government's lack of good faith. Since the Government is entitled to a presumption that it acted in good faith, *see Torncello v. United States*, 681 F.2d 756, 771, 231 Ct.Cl. 20 (1982); *Librach v. United States*, 147 Ct.Cl. 605, 612, 1959 WL 7633 (1959), a contestant bears the burden of proof on the issue. And, in response to the Government's motion for summary judgment, A–Transport was required to submit sufficient evidence upon which a reasonable trier of fact could find in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 252–55, 106 S.Ct. 2505, 2512–14, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

The only evidence cited by A–Transport in support of its theory—a purported inconsistency between the Government's behavior in seeking A–Transport's agreement to revisions to Item 29 to reflect the new supply point, and the Government's admitted belief that it had the power to unilaterally impose these revisions—does not meet the standard established by *Anderson* and *Celotex*. For one thing, it is entirely consistent with the view that the Government, erroneously believing that a contract had not been formed and that it could thus unilaterally revise the tender, nevertheless reasonably insisted upon A–Transport's agreement to the proposed changes in order to eliminate the untenable position in which it found itself—operating under a tender which reflected the original supply point. A reasonable explanation for the Government's behavior consistent with the evidence of record is a significant factor in the Government's favor. *See Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566 (1974); *see also Joseph L. DeClerk & Assoc., Inc. v. United States*, 26 Cl.Ct. 35, 42 (1992). For another, as the CFC noted, the Government's ultimate selection of A–Transport as primary carrier for more routes than any other carrier significantly undercuts A–Transport's theory.

The appellant's scant evidence does not warrant the conclusion that a reasonable trier of fact could have found in A–Transport's favor on the bad faith issue. We thus conclude the CFC did not err in resolving the issue on summary judgment in the Government's favor.

## CONCLUSION

For all the foregoing reasons, the judgment of the CFC is **AFFIRMED.**