**CARGO CARRIERS, INC.**

v.

**UNITED STATES.**

No. 93–712C.

United States Court of Federal Claims.

Dec. 11, 1995.

James F. Flint, Arlington, Virginia, for plaintiff.

Dean L. Grayson, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for defendant. Capt. Myrna A. Mesa, Military Traffic Command, and Robert Hoff, General Services Administration, of counsel.

## OPINION

YOCK, Judge.

This transportation case involves a challenge by the plaintiff to the General Services Administration's ("GSA") determination that the plaintiff overcharged the Department of the Navy ("Navy") for exclusive-use service in transporting freight between destinations within the United States. A trial was conducted in Washington, D.C., on June 7 and 8, 1995. For the reasons stated herein, and after careful consideration of the entire record and the parties' post-trial briefs, the Court finds in favor of the plaintiff.

### Statement of Facts

In 1985 and early 1986, through directives and solicitations issued by the Military Traffic Management Command (the "MTMC"), the plaintiff, Cargo Carriers, Inc. ("Cargo Carriers"), became interested in transporting freight for the Navy. The MTMC supervises all military transportation procurement. In order to perform this work, the plaintiff submitted rate tender No. 145 to the MTMC, which included proposals or bids on the types of transportation services offered by Cargo Carriers and the respective prices. Rate tender No. 145 conformed in all respects with the prescriptions of the MTMC. Included among these prescripts is the requirement that all rate tenders adopt the MTMC Freight Traffic Rules Publication No. 1A ("MFTRP No. 1A") as a governing publication.

Rate tender No. 145 contained two types of pricing mechanisms. The first, a line-haul rate, relates to the transportation costs to move freight from the point of origin to the destination. This rate is expressed in terms of dollars and cents per hundred weight ("cwt"), and the rate varies depending on the distance the carrier is required to travel. The line-haul charge is the product of the line-haul rate multiplied by the minimum weight selected by the carrier in its rate tender or the actual weight of the shipment, whichever is greater.[1] In the case at bar,

---

1. For example, assume a carrier submits a tender with a line-haul rate of $1.00 cwt, and the carrier states in its rate tender that its line-haul rate will be based on a minimum weight of 35,000 pounds. If the actual weight of the shipment is 20,000 pounds, the line-haul charge will be $350.00 (35,000 × $1.00 cwt). Conversely, if the actual weight of the shipment is 45,000 pounds and the line-haul rate is the same, the line-haul charge will be $450.00 (45,000 pounds × $1.00).

the plaintiff selected 40,000 pounds as the minimum weight to submit to the MTMC in its rate tender. Cargo Carriers also offered a second set of pricing mechanisms as a choice of ten accessorial services to which the Navy could choose to subscribe. Included among these additional services was an option to subscribe to "exclusive-use" service at a rate of $2.10 per mile. According to the MFTRP No. 1A, exclusive-use service entails a carrier devoting a trailer solely to the freight of that shipper, without the breaking of the seals or locks. If the seal is broken during transportation of the cargo, the carrier must provide the shipper with an accounting of how and why the seal was broken. As a result, the shipper is ensured that its cargo will not be commingled with freight different from its own, regardless of whether the shipment fills the trailer to full capacity. Further, the shipper is also guaranteed that the carrier will not transfer the freight to other trailers during the course of transportation.

The MTMC, after reviewing Cargo Carriers' tender and those of other interested carriers, subsequently accepted Cargo Carriers' rate tender and informed the Navy that the plaintiff was approved to transport freight from Charleston, South Carolina, to other points in the United States. Thereafter, the Navy tendered to Cargo Carriers between 40 and 50 shipments over any given ten-day period. Of those shipments, the Navy requested exclusive-use service on approximately 30 shipments. This litigation relates to 27 of those shipments, most of which occurred in 1990.[2] Each of the shipments had a corresponding bill of lading with a series of boxes to indicate the weight and the cubic measurement of a shipment, and a block to be checked if the vehicle was fully loaded. Annotations on the bills of lading for the 27 exclusive-use shipments at issue indicate that the weights of the shipments ranged from 103 pounds to 28,200 pounds. By contrast, a standard semi-trailer has a full capacity of some 45,000 pounds. In addition,

annotations on the bills of lading involved indicate that the cubic measurements of the 27 exclusive-use shipments were in the range of 600 cubic feet, much less than the standard semi-trailer cubic capacity of 2,700 cubic feet. Finally, not one of the bills of lading involved indicate that any of the vehicles were fully loaded. As a result, then, of the Navy's request for exclusive-use service for these 27 shipments, the plaintiff was prohibited from utilizing the unused trailer space for freight from customers other than the Navy, despite the fact that the Navy shipments filled, at the most, half of a standard trailer's capacity. Consequently, the plaintiff submitted charges to the Navy which reflected both the line-haul and exclusive-use charges, and the Navy proffered payment pursuant to these charges.

From October 23, 1991 through May 11, 1992, the GSA audited the charges submitted by the plaintiff with respect to the 27 shipments at issue. Upon completion of the audit, the GSA made a series of deductions from the amounts deemed due by Cargo Carriers. In determining the overcharges, the GSA recalculated the charges for each shipment by applying the line-haul rate included in Cargo Carriers' rate tender to a 45,000 pound minimum weight. The GSA then concluded that any charge above the line-haul rate applied to 45,000 pounds was an overcharge. The result was total deductions of $21,357.32 from compensation the plaintiff had determined as due.[3] As a basis for this action, the GSA first relied on ITEM 106 of MFTRP No. 1A ("Item 106"), which precludes a charge for exclusive use when:

▇ a shipment is overdimensional and subject to ITEMS *415* and *417*, or [2] when a vehicle is loaded to a full visible capacity * * *, or [3] when line-haul charges are based upon a minimum weight of 45,000 pounds or [4] actual weight in excess of 45,000 pounds, or [5] when tender rates are based on Rate Qualifiers PG, PJ, PL,

**2.** As filed, the plaintiff's Complaint included claims for 28 shipments. Shortly after filing the Complaint, however, the plaintiff realized that one of the shipments had an actual weight of some 46,300 pounds, which would bring it within the Item 106 exception. Thus, the plaintiff has withdrawn the claim as to that shipment,

leaving the claims in this case relating to 27 shipments for a total refund requested of $20,-731.14.

**3.** See footnote 1.

PM, PV, PY, ST, or [6] when exclusive use of vehicle or dromedary is required as part of a transportation protective service.

Specifically, the GSA relied on the third exception contained in Item 106 (the "minimum-weight exception"), which precludes a carrier from charging for exclusive use when "line-haul charges are based upon a minimum weight of 45,000 pounds." The GSA, relying on the Comptroller General's opinion in *Advanced Distribution System*, B–248291 (July 10, 1992), posited that Item 106 is not dependent on the minimum weight contained in the carrier's rate tender and upon which a carrier's line-haul charge is based. Rather, the GSA argued that Item 106 is concerned with what the Government would have paid if charged for a trailer's full capacity anyway. Thus, the GSA argued that the minimum-weight exception allows the GSA to *rerate* a shipment as if it weighed 45,000 pounds, and then deduct any charges above the carrier's line-haul rate applied to that 45,000 poundage. Alternatively, the GSA cited ITEM 140 of MFTRP No. 1A ("Item 140") as a basis for the GSA's deductions. Item 140 provides that:

> [I]n no case shall the charge for any shipment from and to the same point, via the same route of movement, be greater than the charge for a greater quantity of the same commodity in the same shipping form * * *.

In other words, a carrier is prohibited from charging a greater amount to ship a lower quantity than a higher quantity of the same commodity via the same service. The GSA argued that Item 140 applied to Cargo Carriers' tender because exclusive-use service and line-haul service are the same service. Thus, since it would cost more to ship a lower quantity with line-haul service, plus exclusive use, than to transport a 45,000 pound shipment with standard line-haul service, the GSA contended that charging the Navy for exclusive-use service violated Item 140.

The plaintiff subsequently appealed each of these deductions to the GSA, explaining that its line-haul charges were based on a 40,000 pound minimum, and, as such, Item 106 was inapplicable. In addition, the plaintiff maintained that exclusive-use service and line-haul service with full capacity loads are not the same service, thereby precluding application of Item 140. The GSA denied each of these appeals and deducted the amounts that the GSA had determined the Navy was overcharged.

On November 22, 1993, the plaintiff filed the present Complaint with this Court challenging the GSA's action and the legal bases for its decision and requesting a refund of $20,731.74, plus interest, costs, and attorney fees. After careful consideration of the entire record after trial, and the parties' post-trial briefs, this Court agrees with the plaintiff that there were no legal bases for the GSA's deductions.

## Discussion

There is no material dispute as to the facts in this action. The plaintiff and the defendant agree that the line-haul rate included in Cargo Carriers' rate tender was based on a minimum weight of 40,000 pounds, that Cargo Carriers offered the Navy exclusive-use service, that the 27 shipments did not fill the full capacity of the trailers, and that Cargo Carriers did, in fact, transport the cargo with exclusive-use service. The questions before the Court are the proper interpretations of Items 106 and 140, and whether they preclude the exclusive-use charges at issue.

At trial, the plaintiff argued that the minimum-weight exception in Item 106 is a fact-specific exception to Item 105, which requires that the carrier's rate tender base its line-haul charge on a minimum weight of 45,000 pounds. As the plaintiff correctly points out, this prerequisite did not occur in this instance; thus, the plaintiff contends, Item 106 is inapplicable to the case at bar. Second, with respect to the application of Item 140, the plaintiff maintains that Item 140 only applies if the carrier charges a higher price to ship a lower quantity than a higher quantity of the same cargo *via the same service*. The plaintiff posits that the GSA incorrectly applied Item 140 because exclusive-use service and line-haul service are not the same service.

The defendant counters with a construction of Item 106 and Item 140 resulting in an

interrelationship between the two that purportedly bars the plaintiff's exclusive-use charges. According to the defendant, Cargo Carriers violated Item 140 because its charges for line-haul service, plus exclusive-use service, exceeded the charge for basic line-haul service applied to a 45,000 pound load. Next, the defendant argues that the GSA then properly invoked the minimum-weight exception of Item 106. The defendant maintains that Item 106 allows the Government to recalculate a carrier's charges based on the line-haul charge included in the carrier's tender applied to 45,000 pounds, and then deduct the difference between the carrier's actual charges with exclusive-use and the GSA's calculations based on the carrier's line-haul rate applied to 45,000 pounds. Finally, the defendant challenges Cargo Carriers' rate tender as an impermissible attempt "to circumvent the exclusive-use exception found in MFTRP 1A, Item 106." The defendant argues that Cargo Carriers purposely included in its rate tender a line-haul charge based on a minimum weight of 40,000 pounds to avoid the application of Item 106. The defendant does not fully explain why this was impermissible or why such a course of conduct is counter to MFTRP No. 1A.

■ When interpreting transportation tariffs, standard principles of contract interpretation apply. *See Southern Pac. Transp. Co. v. United States*, 219 Ct.Cl. 540, 545, 596 F.2d 461, 464 (1979) ("The interpretation of * * * tariffs presents questions not unlike those involved in the interpretation of any other document or contract in dispute."). In particular:

> Unnatural or strained construction is to be avoided, all provisions of the tariff are to be considered in determining the meaning of any one of its provisions, and that interpretation should be derived which will give reasonable meaning to all provisions and not render a part thereof absurd or mere surplusage or create conflicts. So far as possible, effect should be given to every symbol, word, clause, and sentence contained in a tariff. If an ambiguity is found to exist it must, under the rule *contra proferentum*, be construed against the drafter * * *.

*Id.* at 464–65 (footnotes omitted). As such, this Court will examine Items 106 and 140 according to the prescripts of standard contract interpretation.

■ Initially, the Court disagrees with the defendant's interpretation of Item 140. Item 140 reads:

> [I]n no case shall the *charge* for any shipment from and to the same point, via the same route of movement, be greater than the *charge* for a greater quantity of the same commodity in the same shipping form and subject to the same packing provisions at the rate or rates and weight applicable to such greater quantity of freight.

(Emphasis added.) The defendant, in attempting to apply Item 140 to the shipments at issue, maintains that the term "charge" in the first line of Item 140 means the carrier's charge for line-haul service, plus any accessorial services. Thus, the defendant argues that Cargo Carriers violated Item 140 because under Cargo Carriers' tender, the charge for shipping, for example, a 12,000 pound shipment with line-haul service, plus exclusive use, was greater than the charge to ship 45,000 pounds simply with standard line-haul service.

■ The defendant's construction of Item 140, however, conflicts with both the plain language of Item 140 and its underlying purpose. First, the defendant's rendering of Item 140 requires varying and contradictory uses of the term "charge" in Item 140. In pertinent part, Item 140 states:

> [I]n no case shall the *charge* for any shipment * * * be greater than the *charge* for a greater quantity of the same commodity * * *.

(Emphasis added.) The defendant interprets the provision as meaning that the charge for line-haul service, plus exclusive use, cannot be greater than the charge for a 45,000 pound shipment with line-haul service. Thus, according to the defendant, "charge" in the first line means the charge for line-haul service, plus accessorial service. While later in Item 140, the term "charge" relates solely to the charges for standard line-haul service. However, one of the central tenets of con-

tract interpretation is that various terms within a contract should be interpreted consistently. *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965). *Accord International Transducer Corp. v. United States,* 30 Fed.Cl. 522, 526 (1994). From this maxim, it follows that courts should generally interpret specific words within a contract, and particularly within the same clause, consistently. Indeed, there is no indication in Item 140 that the "charge" in the first line of Item 140 refers to a different set of pricing schemes than the "charge" referred to later in Item 140. Thus, the defendant's contradictory use of the term "charge" in Item 140 is violative of basic terms of contract construction.

Further, the defendant's interpretation of the term "charge" in the first line of Item 140, results in Item 140 comparing apples and oranges and contradicts the purpose underlying Item 140. The GSA would, pursuant to the defendant's construction of Item 140, contrast the charge for line-haul service with exclusive use, to the charge for basic line-haul service for a 45,000 pound shipment. This is contrary to Item 140's purpose. Item 140 addresses the Government's concern that carriers were charging a higher rate to ship a lower quantity of the same commodity, via *the same service. Milne Truck Lines, Inc.,* 62 Comp.Gen. 29 (1982). This is a legitimate concern. It is obviously unfair for a carrier to charge the Government a higher line-haul rate to ship lower quantities. In such a case, the Government is receiving no added benefit as a result of the extra charges. In this way, Item 140 is comparing apples to apples. There is no such compelling policy reason when exclusive-use service is involved, however. To equate what a carrier charges for line-haul service for a 30,000 pound shipment using exclusive-use service with the charge for standard line-haul service on a 45,000 pound shipment serves no overriding policy goals. The two services, line-haul with exclusive use and simple line-haul, are wholly different services. When a carrier charges for exclusive use, not only is the Government receiving an additional, distinct benefit beyond basic line-haul service, but the carrier forgoes the opportunity to increase its revenue. *See Campbell "66" Express, Inc. v.*

*United States,* 157 Ct.Cl. 365, 368, 302 F.2d 270, 271 (1962) (Describing the "benefit[s] defendant intended to obtain by requesting exclusive use."); *Garrett Freightlines, Inc. v. United States,* 236 F.Supp. 594 (E.D.Id. 1964). As explained in *Garrett Freightlines:*

> [T]his court is of the opinion that there is a difference. * * * the Government desired expedited service * * *. This type of service is more assured when exclusive-use service is requested. Also when exclusive-use service is provided, the shipper is guaranteed that his freight will not be mixed with the freight of another, nor will it be transferred to another vehicle once the trip begins.

*Id.* at 597. Moreover, the MTMC's own rules explicate the benefits of exclusive-use service as opposed to basic line-haul service. The MFTRP No. 1A characterizes exclusive-use service by three elements: (1) the vehicle is devoted exclusively to the transportation of that shipment, (2) without the breaking of seals or locks, and (3) without the transfer of lading for the carrier's convenience. As a result of exclusive-use service, then, the Government receives a number of distinct, identifiable benefits that it would not have with standard line-haul service. For instance, Cargo Carriers could not mix the Navy's freight with that of other shippers, and Cargo Carriers could not transfer the freight to other vehicles. This increased the likelihood that the Navy's freight would not be damaged. Moreover, since exclusive-use service precludes other freight on the carrier's trailers, there was a higher likelihood that the Navy would receive expedited service. In addition, for the carrier, exclusive use results in lost revenue opportunities. Since Cargo Carriers could not mix other freight with the Navy's, Cargo Carriers was forced to forego the opportunity to fill each trailer to full capacity with other freight and thus obtain a greater profit. Accordingly, the defendant's interpretation attempting to compare line-haul service with exclusive use to basic line-haul service is contrary to Item 140's underlying purpose.

Finally, the defendant's interpretation of the term "charge" in the first line of Item 140 is unreasonably vague. During the trial,

one of the defendant's witnesses hypothesized that the term "charge" in the first line of Item 140 is the charge for line-haul service, plus all accessorial services. However, upon being pressed by the Court, the witness admitted that this is not the case with all accessorial services, such as protective services. The witness then modified his earlier statement by explaining that while the term "charge" in Item 140 includes charges for accessorial services, it is only those accessorial services that pertain to weight. However, there is no indication in the language of Item 140, nor in Items 105 or 106, that this is the case. In short, in referencing the MFTRP, the guidelines for all Government shipping, there is no way a carrier can discern, from Item 140's language that "charge" in the first line of Item 140 includes charges for accessorial services in the first instance and further involves only those accessorial services that pertain to weight. Accordingly, since Item 140's wording is ambiguous, under the doctrine of *contra proferentum*, it should be construed against the drafter—in this case, the Government.

For the foregoing reasons, this Court finds that the defendant's construction of Item 140 is counter to the plain language of MFTRP No. 1A and the purpose underlying the provision. As such, the Court, by applying Item 140's plain language, finds that Item 140 relates only to those instances when a carrier charges a higher rate to ship a lower quantity rather than a higher quantity of the same commodity with the same service. This was not the case in this instance. In the case at bar, the Government requested and received line-haul service, plus exclusive use, thus resulting in the Government receiving a benefit beyond that provided by basic line-haul service.

■ In addition, the Court finds that the defendant has also misinterpreted Item 106. As discussed above, the minimum-weight exception to Item 106 states that a carrier cannot charge for exclusive-use service if "line-haul charges are based upon a minimum weight of 45,000 pounds * * *." The defendant posits that the term "line-haul charges" pertains to the charge calculated by the GSA, during an audit, based on the carrier's line-haul rate applied to a 45,000 pound minimum weight, and not the carrier's actual line-haul charge based on the minimum weight contained in its rate tender. This construction, according to the defendant, allows the GSA to rerate all shipments to determine the line-haul charge based on 45,000 pounds and then deduct the amounts above this sum.

■ Again, however, the defendant's construction of the minimum-weight exception conflicts with the plain meaning of Item 106 and its purpose. First, the defendant's interpretation of the phrase "line-haul charge" contradicts other sections of Item 106. A contract, however, should always be interpreted as a whole. *Merando, Inc. v. United States*, 201 Ct.Cl. 28, 30, 475 F.2d 603, 605 (1973); *Raytheon Co. v. United States*, 2 Cl.Ct. 763, 768 (1983), *aff'd*, 730 F.2d 1470 (1984). Item 106, Paragraph 2, describes the manner in which a carrier should complete a Department of Defense ("DoD") tender when offering exclusive-use service:

> Carriers desiring to offer exclusive use of vehicle, as an optional accessorial service under ITEM *105*, should complete Section F(2) of the DOD tender by entering the appropriate charge for EU(1). *However, if carriers filing tenders with minimum weights based on 45,000 pounds or more*, or one of the following Rate Qualifiers PG, PJ, PL, PM, PV, PY or ST, desire to offer exclusive use of vehicle they must complete Section F(2) of the DOD tender by entering EU(1) $*XX.XX*. The "*XXXX's*" indicate that the service is provided but cannot be charged for.

(Emphasis added.) Thus, the second paragraph of Item 106, in describing how a carrier can offer exclusive-use service, states that if a *carrier* files a rate tender with minimum weights based on 45,000 pounds, it can provide exclusive-use service but cannot charge for it. In other words, when a carrier bases its line-haul charges on a minimum weight of 45,000 pounds, it cannot charge for exclusive-use service. If the defendant's construction of the first paragraph of Item 106 is correct, why then would Paragraph 2 of Item 106 state that a *carrier's rate tender* with a minimum weight of 45,000 pounds precludes a

charge for exclusive-use service? The defendant's explanation of the minimum-weight exception, which interprets "line-haul charge" to relate to the GSA's ability, during an audit, to rerate shipments, and Item 106, Paragraph 2, are irreconcilable. In fact, this is because the defendant's interpretation is simply incorrect. The only inference from Item 106, Paragraph 2 is that a carrier cannot charge for exclusive-use service if the line-haul rate contained in *its* tender is based on a minimum weight of 45,000 pounds. Read in conjunction with Item 106, Paragraph 1, which states that a carrier cannot charge for exclusive use if line-haul charges are based on a minimum weight of 45,000 pounds, the only conclusion is that the phrase "line-haul charge" in the minimum-weight exception relates to the *carrier's* line-haul charge resulting from the line-haul rate applied to the minimum weight included in the carrier's tender.

The defendant's interpretation of the minimum-weight exception in Item 106 also conflicts with the remainder of Item 106, Paragraph 1. As discussed *supra*, Item 106, Paragraph 1, lists a series of six exceptions to the general rule, located at Item 105, that a carrier can charge the Government for exclusive-use service. Of these six exceptions, there is no dispute as to the mechanics of five. Examination of these five other exceptions reveals the specious nature of the defendant's interpretation of the minimum-weight exception. There are four exceptions which relate to the nature of the cargo: (1) when a shipment is overdimensional, (2) when a vehicle is loaded to full visible capacity, (3) when the actual weight of a shipment exceeds 45,000 pounds, and (4) when exclusive use is required as part of a protective service requested during transportation. Finally, the fifth exception relates to how a carrier structures its tender—when a carrier bases its rate tender on rate qualifiers PG, PJ, PL, PM, PV, PY, or ST. These rate qualifiers are a method of charging for transportation in which the Government pays for the entire trailer, regardless of the size of the shipment. For instance, the rate qualifier PV means that the shipper is charged per vehicle, or with the rate qualifier PM, the shipper is charged per mile. Two points are

pertinent with respect to these exceptions. First, with all of these exceptions, application of each is determined by reference to either the nature of the shipment or the carrier's tender. Second, each of these exceptions precludes exclusive-use charges because due to either the nature of the cargo or the carrier's tender, the Government is already paying for the use of the entire trailer, *in fact.* Thus, the underlying purpose of Item 106 seems to be to deny exclusive-use charges when the Government is already, in fact, paying for the entire trailer. As a result, the carrier cannot again charge for exclusive use.

On the face of the minimum-weight exception, it would seem to fall within the second category of exceptions—those that are triggered by the carrier's rate tender, such as when a carrier bases its rate tender on the described rate qualifiers. The defendant, however, would have the minimum-weight exception relate to the GSA's power, during an audit, to recalculate the charge for a shipment based on a minimum weight of 45,000 pounds and then to deduct any charges for exclusive use over this amount. However, such an interpretation would make the minimum-weight exception an anomaly of the highest order. As explained above, in all five of the exceptions, out of a series of six, two concepts consistently apply—one, they are triggered by the same type of events, either the nature of the cargo or the rate tender, and two, each exception serves the same general purpose, to preclude a carrier from charging for exclusive use when the Government is already paying for the use of the entire trailer, *in fact.* Yet, the defendant would have one exception, the minimum-weight exception, pertain to neither of these two concepts. The Court simply cannot endorse such an anomalous construction of Item 106.

To this Court, the language of Item 106 could not be more clear. The minimum-weight exception is intended to preclude a charge for exclusive use when the carrier bases its line-haul charges on a minimum weight of 45,000 pounds. This conforms to the plain language of the exception. This construction also comports with the overall

construction and underlying purpose of Item 106. The Court's interpretation results in the exception being applied in a manner consistent with the other exceptions—that is, by reference to either the nature of the carrier's cargo or the carrier's rate tender. Moreover, the Court's application of the minimum-weight exception comports with the purpose of Item 106 as a whole—to deny exclusive-use charges when the Government is already, *in fact,* paying for the entire trailer. This is the case under the minimum-weight exception because the capacity of a standard trailer is 45,000 pounds. Thus, if a carrier bases its line-haul charge on a minimum weight of 45,000 pounds, the shipper is already paying for the use of the entire vehicle, regardless of the actual size of the shipment.

Pursuant to this construction, since Cargo Carriers' rate tender proposed a line-haul charge based upon a 40,000 pound minimum, not 45,000 pounds as required by the minimum-weight exception of Item 106, it is clear that Item 106 does not apply to the shipments at issue.

Finally, the Court feels compelled to address the defendant's criticism of the plaintiff having submitted a rate tender with line-haul charges based on a minimum weight of 40,000 pounds. The defendant argues that Cargo Carriers purposely based its line-haul charges on a minimum weight of 40,000 pounds to avoid application of Item 106, and that, for some inexplicable reason, this was impermissible. The Court has two responses to this argument. First, such actions by the carrier seem to be perfectly acceptable under Item 106. There is no provision in Item 106, or any other Item in MFTRP No. 1A, proscribing rate tenders with line-haul charges based on a minimum weight less than 45,000 pounds. In fact, Item 106 seems to open the door to such rate tenders by specifying that if a carrier submits a rate tender with a line-haul rate based on 45,000 pounds, it cannot charge for exclusive use. Second, the defendant's argument mischaracterizes the relationship between a carrier and the MTMC. Under the procedure implemented here, the MTMC issued a notice or solicitation to potential carriers interested in transporting cargo for the Navy, explaining that they should submit rate tenders to the MTMC conforming to the MTMC's rules and publications. This notice constitutes an invitation for interested carriers to submit bids in the form of rate tenders. *See A–Transport Northwest Co. v. United States,* 36 F.3d 1576, 1581 (Fed.Cir.1994). When Cargo Carriers subsequently submitted a rate tender, this was clearly an offer on the part of the plaintiff to enter into a contract for transportation services. *A–Transport Northwest Co.,* 36 F.3d at 1581; *Matter of: Federal Transport, Inc.,* 68 Comp.Gen. 451, 453 (1989). After the MTMC reviewed Cargo Carriers' rate tender and determined that the tender, including the line-haul minimum-weight and exclusive-use charges offered, were advantageous to the Government, the MTMC then chose to accept Cargo Carriers' rate tender and entered into a contract with Cargo Carriers. *A–Transport Northwest Co.,* 36 F.3d at 1581; *Federal Transport,* 68 Comp.Gen. at 453. The MTMC had the choice of either accepting or rejecting Cargo Carriers' rate tender, it was not foisted upon the MTMC. In other words, it was the MTMC that chose to contract with Cargo Carriers, and this decision was made on the basis of the very same tender that the defendant now challenges as being manipulative. Now, after the MTMC affirmatively chose to contract with Cargo Carriers, the defendant attempts to challenge the rate tender as invalid. Not only is this argument specious at best, but it seems to this Court to be a clear breach of contract. The plaintiff has a contractual right to be paid according to the terms of its contract.

In addition to the factors discussed above, the Court also feels compelled to demonstrate the unusual results that flow from the defendant's construction of Items 106 and 140. As described below, Item 106 and Item 140, under the defendant's interpretation, virtually eliminate exclusive-use charges, except for those limited circumstances in which the cargo is transported exceedingly short distances. As explained *supra,* the defendant applies Item 106 and Item 140 as a ceiling or cap, with the upper limit being the amount the Government would have paid to transport 45,000 pounds with standard line-haul service. As a result, a carrier is pre-

cluded from charging for exclusive use any-time the combination of the line-haul charge, plus exclusive-use charges, would result in a levy higher than the carrier's line-haul rate applied to 45,000 pounds. The following example exhibits the unreasonableness or senselessness of such a construction. Under Cargo Carriers' rate tender, if the Navy submitted a 3,600 pound shipment to Cargo Carriers, the line-haul charge would be $460.00 (40,000 pound minimum × $1.15 cwt).[4] However, if the Government requested exclusive-use service at Cargo Carriers' rate of $2.10 per mile, Cargo Carriers would be unable to charge for exclusive-use service unless the freight was to be shipped approximately 27 miles. This is because, according to the defendant's interpretation, Item 106 allows the GSA to rerate all shipments with exclusive use as if the shipments actually weighed 45,000 pounds, then deduct any charge above this amount as an overcharge. The upper limit, then, above which Cargo Carriers could not charge the Government would be $517.50 (45,000 pounds × $1.15 cwt). Thus, Cargo Carriers could only charge for exclusive use the difference between its actual line-haul charges for the shipment and the line-haul charges applied to 45,000 pounds, or some $57.50 ($517.50–$460.00). This equates to exclusive-use charges for approximately 27 miles ($57.50/$2.10). Consequently, the defendant's interpretation eliminates exclusive-use charges unless the freight is to be transported exceedingly short distances. However, if Cargo Carriers, realizing that it could not recoup its exclusive-use charges if the shipment travelled more than 27 miles, refused to ship the freight with exclusive-use service, the Government could allege a breach of tender, or the Government could also reject subsequent tenders submitted by the carrier for future freight transportation, in effect, debarring Cargo Carriers. Moreover, this is the case despite the fact that, as discussed *supra*, the Government receives a distinct benefit and the carrier loses possible revenue opportunities as a result of the Government's request for exclusive-use service.

It may be that the GSA, as a policy matter, wants to limit a carrier's exclusive-use charges to the price the Government would pay for a 45,000 pound shipment (a full load) at a standard line-haul rate. However, Items 106 and 140, as written, do not allow for this limitation. The GSA may not simply rewrite the plaintiff's rate tender to suit its view of what the Government's transportation policy should be. The plain language and generally recognized purposes of these Items provide no prior notice that they could be applied in such a manner. As such, Cargo Carriers was not given adequate notice, prior to its performance of the contract, that exclusive-use service would be limited in such a way. To interpret Item 106 and Item 140 in the manner described by the defendants, after Cargo Carriers provided exclusive-use service, would simply be unreasonable and in violation of their contractual agreement.

In final summary, the Court finds that the minimum-weight exception contained in Item 106 applies in those instances where the carrier includes in its rate tender a line-haul rate based on a minimum weight of 45,000 pounds. That did not happen in this case. The plaintiff included a 40,000 pound minimum weight in its rate tender. Thus, the Item 106 exception does not apply to this case. Further, Item 140 precludes a carrier from charging a higher rate for a lower quantity of the same commodity via the same service. The plaintiff's charges in this case were based on a line-haul charge, plus a charge for exclusive-use service. Exclusive-use service is simply not the same service as line-haul service. As such, Item 140 does not apply to the case at bar. The plaintiff in this case is entitled to be paid its line-haul charges as specified in its rate tender and for the exclusive-use service also as specified in its rate tender.

Accordingly, it follows from the above determination that the plaintiff is entitled to recover $20,731.74, which is the sum the GSA had determined to be an overpayment by the Navy for the plaintiff's exclusive-use service during the GSA's audit.

---

**4.** As noted *supra,* the line-haul rate included in Cargo Carriers' rate tender was $1.15 cwt for distances up to 350 miles.

The plaintiff, however, aside from its refund request, also included in its Complaint a prayer for an award of interest, costs, and attorney fees. As to the plaintiff's plea for interest, the Court must answer in the negative. The well-established rule is that a party cannot recover interest from the Government absent an express waiver of sovereign immunity by Congress. *Library of Congress v. Shaw,* 478 U.S. 310, 315, 106 S.Ct. 2957, 2962, 92 L.Ed.2d 250 (1985); *Alaska Airlines, Inc. v. Johnson,* 8 F.3d 791, 798 (Fed.Cir.1993) (*citing to FDL Technologies, Inc. v. United States,* 967 F.2d 1578, 1581 (Fed.Cir.1992)). Further, the burden is on the plaintiff to provide the Court with the authority that would allow for the payment of interest. In the present case, payment for Cargo Carriers' transportation contract is governed by 31 U.S.C. § 3726 (1988). However, section 3726 does not provide for the payment of interest on a carrier's claim against the United States. *See* 31 U.S.C. § 3726 (1988) (omitting any reference to recovery of interest by a carrier); *Dalton v. Sherwood Van Lines, Inc.,* 50 F.3d 1014 (Fed.Cir.1995). Moreover, the plaintiff cannot avail itself of the waiver of sovereign immunity contained in the Contract Disputes Act's ("CDA"), 41 U.S.C. § 601 *et. seq.,* section 611, since carrier transportation contracts do not come within the scope of the CDA's coverage. *See Dalton,* 50 F.3d at 1017. The only remaining possibility left to the plaintiff, then, is the waiver of sovereign immunity contained in the Prompt Payment Act, 31 U.S.C. § 3902 (1988), which allows a party to recover interest from an agency when the agency is derelict in remitting amounts deemed due and owing. However, the Prompt Payment Act specifically exempts interest payments in situations, such as the present case, where nonpayment by the agency is a result of "a dispute between the head of an agency and a business concern over the amount of payment or compliance with the contract." 31 U.S.C. § 3907(c) (1988). Accordingly, this Court finds that there is no specific waiver of sovereign immunity providing for the payment of interest in the present case, and the plaintiff's prayer for interest on its claim is denied.

With respect to the plaintiff's possible recovery of attorney fees and costs, if the plaintiff retains its desire to receive attorney fees and costs, it may make a proper application pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1) (1994), within 30 days of the date of the judgment in this case. *See* RCFC 81(e).

## CONCLUSION

For the foregoing reasons, this Court finds that the plaintiff is entitled to recover the sum of $20,731.74, which is the sum invalidly withheld from the plaintiff by the Government under their transportation contract agreement. No further interest on this sum is due. Accordingly, the clerk of the Court is directed to enter judgment for the plaintiff.

Court costs to the plaintiff.